STATE OF NEBRASKA, APPELLEE, V.
RUSSELL W. HARMS, APPELLANT.
643 N.W.2d 359

Filed May 3, 2002. No. S-00-1157.

James R. Mowbray and Robert W. Kortus, of the Nebraska Commission on Public Advocacy, for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

HENDRY, C.J.

## I. INTRODUCTION

Russell W. Harms was convicted of first degree murder and use of a deadly weapon to commit a felony in connection with the December 10, 1999, death of Tennyson Kelsay. Harms was sentenced to life in prison on the murder charge and not less than nor more than 20 years' imprisonment for use of a weapon. Harms appeals.

## II. FACTUAL BACKGROUND

At approximately 12:10 p.m. on December 10, 1999, Harms shot 84-year-old Kelsay 15 times with a .22-caliber semiautomatic rifle in the parking lot of a shopping center in Auburn, Nebraska. Harms was alone in his white pickup truck when he saw Kelsay, a stranger to him, in the parking lot. Harms picked up his rifle, pointed it out the window of his truck, and fired one shot at Kelsay, who was standing 5 to 8 feet away. There was a brief pause in the shooting as Kelsay "recoiled" and then started to fall backward to the ground. As Kelsay was falling, Harms resumed firing his rifle in a rapid succession of shots that continued after Kelsay was on the ground. Kelsay died as a result of the multiple gunshot wounds.

After the shooting, Harms slowly drove a half block to his trailer home, which was located in a trailer park across the highway from the shopping center and visible from the scene of the shooting. At approximately 12:14 p.m. Holly Plager, a dispatcher for the Nemaha County Sheriff's Department, received a 911

emergency dispatch service (911) call from a cellular telephone. The caller identified himself as Russell Harms. Harms asked Plager for his lawyer's telephone number. Plager attempted to keep Harms on the telephone line, but for an unknown reason, the call was soon lost. Plager called Harms back and resumed speaking with him.

Auburn police officers Daniel White and Eric Adams had been called to the shopping center parking lot within minutes of the shooting. Witnesses at the scene described a white pickup truck and provided a license plate number. After Adams radioed in the license plate number, Harms' ownership of the truck was confirmed. The officers could see Harms' trailer from where they stood in the parking lot, so they immediately went to the trailer.

While the officers were in front of Harms' trailer, Plager called White on the radio and notified him that Harms had called 911 and was on the telephone requesting his attorney. White then advised Plager to tell Harms that "Officer Adams and [White] were out front, that we wouldn't hurt him and we would take him up to [the police station] and have contact with his attorney." Plager did so, and Harms again requested to speak with his attorney. White then spoke to Harms utilizing his cruiser's "public address system" in an attempt to get Harms to come out from the trailer. White repeated the assurances to Harms that he would not be hurt and would be taken to see his attorney. At that point, Harms told Plager he would step outside.

Harms stepped outside of the trailer without any weapons, closed the door, and stood on the stairs. White spoke to Harms, reassuring him as he had previously. Adams then told Harms to step away from the trailer and lie down on the asphalt. When Harms did so, White handcuffed him and verbally informed him of his *Miranda* rights. Harms again requested an attorney.

Harms was transferred to the police station. He sat in a chair next to White while the police attempted to contact his attorney. During this time, White advised Harms again of his *Miranda* rights through a written *Miranda* advisement form, which Harms signed. After approximately 1 hour had elapsed, Harms' attorney arrived and spoke to Harms. Harms was then placed in jail.

On February 2, 2000, Harms was charged with first degree murder and use of a deadly weapon to commit a felony. On May

11, Harms gave notice pursuant to Neb. Rev. Stat. § 29-2203 (Reissue 1995) of his intention to rely upon the insanity defense and to plead not responsible by reason of insanity at the time of the offense.

A bench trial was held on August 15 and 16, 2000. At trial, Harms presented the expert testimony of Dr. William Logan, together with Dr. Logan's written psychiatric evaluation of Harms. Dr. Logan discussed Harms' lengthy history of mental illness and, specifically, Harms' condition as a paranoid schizophrenic. Dr. Logan testified that Harms often went to his attorney to discuss his delusional thoughts about "people bothering him" and had previously felt urges to "kill somebody at random." Dr. Logan stated that in the weeks prior to the shooting, Harms had experienced "command voices" telling him to shoot someone. Dr. Logan defined a "command voice" as a "voice that is experienced and instructs you to do something or [is] harassing you to do something." Dr. Logan also described Harms' numerous hospitalizations and difficulties with antipsychotic medication since 1987.

Dr. Logan further testified that Harms was having a psychotic episode at the time of the shooting. According to Dr. Logan, Harms told him during their meeting after Harms was arrested that he "remembered hearing the words 'not a baby' going on in his head" prior to shooting Kelsay. Specifically, Dr. Logan testified:

> And [Harms] said he heard voices that said, "looks like that older fella had enough years under his belt." He said he perceived them— they came from outside of himself. He then grabbed the rifle and shot. And that's what he described having happened right at that period of time.

Dr. Logan stated that he did not know whether Harms was also experiencing command voices on the morning of the shooting in addition to hearing these other voices.

Finally, Dr. Logan testified that Harms had not previously had a specific delusion about Kelsay, but he was "sure that Mr. Kelsay intersected Mr. Harms' delusional system at some point either by the fact that he was at the shopping center and there was some delusion about the shopping center or something about Mr. Kelsay himself intersected his delusion." In Dr.

Logan's opinion, Harms' delusional thinking at the time of the shooting prevented Harms from rationally considering whether the act of shooting Kelsay was right or wrong. On this basis, Dr. Logan concluded that Harms was insane at the time of the shooting.

The State responded by offering the expert testimony of Dr. Sanat Roy, together with Dr. Roy's written evaluation of Harms. Dr. Roy testified that Harms was legally sane at the time of the shooting because he understood the nature of the act he had committed and was able to distinguish right from wrong with respect to the shooting. Dr. Roy stated, "Based on my evaluation with him, certainty [sic] he was responsible for his behavior at the time of his alleged act." Dr. Roy disputed any contention that Harms' thought of " 'this old guy looks like he had a lot of good years' " was a command voice or command hallucination. Dr. Roy stated, "Command hallucination tells you, Roy, go out, kill that man. Kill that man. Kill that man. Roy, this person is holding your soul. If you don't kill him, you'll be dead. Kill him, kill him. That is command hallucination." Dr. Roy testified that individuals experiencing a command hallucination are "so disturbed they cannot function." He concluded that based on his personal meetings with Harms, as well as others' accounts of Harms' actions before, during, and after the shooting, Harms did not behave like a person who was hallucinating or experiencing command voices at the time of the shooting.

The State also presented the testimony of two eyewitnesses who described the shooting and Harms' actions afterward. One witness, Shawn Clark, testified that Harms left the parking lot in his truck at a normal rate of speed and was "[n]ot [in] a real big hurry." The other witness, Kenneth Hatten, testified that Harms did not appear to be in a hurry to leave the area, since he drove away "[s]low, deliberate, like watching."

Plager, the dispatcher, also testified at trial. She described the details of her conversation with Harms after the shooting, including Harms' requests for his attorney. Plager testified that Harms was not excited or agitated when she spoke with him on the telephone and that he was "just kind of okay." She noted that Harms did talk "kind of choppy" and that he sounded as if he were "confused," "distracted," "disoriented," and not focused.

Harms never told Plager during their conversation that he was experiencing command voices or hallucinating.

White and Adams testified at trial. Both officers described their involvement in arresting Harms on the day of the shooting. They discussed Harms' behavior at the time of arrest, including Harms' request for his attorney and the fact that during and after the arrest, Harms did not tell the officers that he was hallucinating or experiencing command voices.

The district court found Harms guilty on both counts and sentenced Harms to life in prison for the murder charge and not less than nor more than 20 years' imprisonment for use of a weapon. Both sentences were to be served consecutively. Harms filed a notice of appeal and a poverty affidavit and was granted leave to proceed in forma pauperis on appeal.

## III. ASSIGNMENTS OF ERROR

Harms assigns, rephrased, that the district court erred in (1) admitting and considering evidence of Harms' silence and requests for counsel in violation of the U.S. Supreme Court's decision in *Wainwright v. Greenfield*, 474 U.S. 284, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986); (2) finding that Harms was not insane at the time of the shooting; and (3) improperly interpreting and applying the elements of first degree murder.

## IV. STANDARD OF REVIEW

■ Determination of a jurisdictional issue which does not involve a factual dispute is a matter of law which requires an appellate court to reach an independent conclusion. *State v. VanAckeren, ante* p. 222, 639 N.W.2d 112 (2002).

■ A conviction in a bench trial of a criminal case is sustained if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction. *State v. Campbell*, 260 Neb. 1021, 620 N.W.2d 750 (2001); *State v. Beyer*, 260 Neb. 670, 619 N.W.2d 213 (2000). In making this determination, an appellate court does not resolve conflicts in evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented, which are within a fact finder's province for disposition. *Campbell, supra*; *Beyer, supra*.

■ In a bench trial of a law action, including a criminal case tried without a jury, erroneous admission of evidence is not reversible error if other relevant evidence, admitted without objection or properly admitted over objection, sustains the trial court's factual findings necessary for the judgment or decision reviewed; therefore, an appellant must show that the trial court actually made a factual determination, or otherwise resolved a factual issue or question, through the use of erroneously admitted evidence in a case tried without a jury. *State v. Lara*, 258 Neb. 996, 607 N.W.2d 487 (2000). The appellant must show that the trial court made a finding of guilt based exclusively on the erroneously admitted evidence. *Id.* If there is other sufficient evidence to support the finding of guilt, the conviction will not be reversed. *Id.*

■ The verdict of the finder of fact on the issue of insanity will not be disturbed unless there is insufficient evidence to support such a finding. *State v. Ryan*, 233 Neb. 74, 444 N.W.2d 610 (1989).

## V. ANALYSIS

### 1. JURISDICTION

■Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it. *State v. McLemore*, 261 Neb. 452, 623 N.W.2d 315 (2001). The State contends that this court lacks jurisdiction because the district court's order granting Harms' request to proceed in forma pauperis does not comply with Neb. Rev. Stat. § 29-2306 (Cum. Supp. 2000). Section 29-2306 states:

> If a defendant in a criminal case files, within thirty days after the entry of the judgment, order, or sentence, an application to proceed in forma pauperis in accordance with sections 25-2301 to 25-2310 with the clerk of the district court, then no payment of the docket fee shall be required of him or her unless the defendant's application to proceed in forma pauperis is denied. . . . If an application to proceed in forma pauperis is filed and granted, the Court of Appeals or Supreme Court shall acquire jurisdiction of

the case when the notice of appeal is filed with the clerk of the district court.

The State argues that jurisdiction is lacking because the district court judge did not sign the order granting Harms' application to proceed in forma pauperis within 30 days after the entry of Harms' sentence. This argument is without merit. The relevant date under § 29-2306 is the date the defendant files the application to proceed in forma pauperis, not the date on which the court grants the application. The record shows, and the State acknowledges, that Harms timely filed his notice of appeal, application to proceed in forma pauperis, and poverty affidavit within 30 days after the entry of his sentence. Since the district court granted Harms' application to proceed in forma pauperis, the "Supreme Court shall acquire jurisdiction of the case when the notice of appeal is filed with the clerk of the district court." See § 29-2306. We determine that the requirements of § 29-2306 have been satisfied. Accordingly, we determine that we have jurisdiction over Harms' appeal.

### 2. CONSTITUTIONAL RIGHT TO SILENCE AND COUNSEL

In his first assignment of error, Harms argues that the district court erred in allowing and considering evidence of Harms' silence and his requests for counsel as substantive evidence of his guilt and sanity. He asserts that the State violated the U.S. Supreme Court's rulings in *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), and *Wainwright v. Greenfield*, 474 U.S. 284, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986), by introducing evidence of Harms' silence and requests for counsel as a means to contest his insanity defense. We note that while this court has addressed alleged violations of *Doyle* on several occasions, this case presents the first opportunity for us to consider the *Wainwright* decision, which applied the *Doyle* rule in a case involving an insanity defense.

In *Doyle, supra*, the U.S. Supreme Court held that the State may not "seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest." 426 U.S. at 611. The Supreme Court found that a defendant's postarrest, post-*Miranda* silence is "insolubly

ambiguous" as to whether the defendant is guilty or merely exercising his rights in accordance with the implicit assurance in the *Miranda* warnings that "silence will carry no penalty." 426 U.S. at 617-18. The Supreme Court thus determined that the State's use of a defendant's postarrest, post-*Miranda* silence to impeach the defendant would be "fundamentally unfair" and a violation of the Due Process Clause of the 14th Amendment. 426 U.S. at 618.

The Supreme Court extended the due process rationale of *Doyle* in *Wainwright, supra,* a case in which the State introduced a defendant's postarrest, post-*Miranda* silence as substantive evidence of his sanity. At the defendant's jury trial in *Wainwright,* the defendant did not testify; however, police officers involved with the defendant's arrest did testify, at the State's request, about how the defendant "had exercised his right to remain silent and had expressed a desire to consult counsel before answering any questions." 474 U.S. at 287. The State referred to the officers' testimony again in closing arguments to the jury, arguing that the defendant's refusal to answer and his requests for an attorney showed that the defendant was sane.

In analyzing *Wainwright,* the Supreme Court declined to distinguish the case from *Doyle*:

> We find no warrant for the claimed distinction in the reasoning of *Doyle* and of subsequent cases. The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony. It is equally unfair to breach that promise by using silence to overcome a defendant's plea of insanity. In both situations, the State gives warnings to protect constitutional rights and implicitly promises that any exercise of those rights will not be penalized. In both situations, the State then seeks to make use of the defendant's exercise of those rights in obtaining his conviction. The implicit promise, the breach, and the consequent penalty are identical in both situations.

*Wainwright v. Greenfield,* 474 U.S. 284, 292, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986). The Court found in *Wainwright,* as it did in *Doyle,* "the problem of fundamental unfairness that flows from the State's breach of its implied assurances." 474 U.S. at 294. In

so finding, the Court confirmed and reiterated its prior holdings in *Jenkins v. Anderson*, 447 U.S. 231, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980), and *Fletcher v. Weir*, 455 U.S. 603, 102 S. Ct. 1309, 71 L. Ed. 2d 490 (1982), which determined that the State's impeachment use of a defendant's pre-*Miranda* silence, whether prearrest or postarrest, does not violate the 14th Amendment. See *Wainwright, supra.*

We also note that requests for counsel, as well as actual silence, constitute "silence" for purposes of analyzing potential *Wainwright* violations. In *Wainwright*, the U.S. Supreme Court stated that "[w]ith respect to post-*Miranda* warnings 'silence,' we point out that silence does not mean only muteness; it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted." 474 U.S. at 295 n.13. The Eighth Circuit Court of Appeals has similarly stated that "we must treat a defendant's invocation of his *Miranda* rights not as a statement, but as post-*Miranda* warnings silence." *Fields v. Leapley*, 30 F.3d 986, 990 (8th Cir. 1994). Additionally, this court has found that refusal to give a statement constitutes silence. *State v. Woods*, 249 Neb. 138, 542 N.W.2d 410 (1996). Accordingly, we will consider Harms' requests for counsel, as well as his actual silence, as "silence" for purposes of determining whether a *Wainwright* violation has occurred.

As an initial matter, Harms invites this court to expand the *Doyle* and *Wainwright* protections to bar any use by the State of a defendant's prearrest, pre-*Miranda* silence. We decline to do so. In *State v. Lofquest*, 223 Neb. 87, 388 N.W.2d 115 (1986), this court adopted *Doyle*'s prohibition against use of a defendant's silence during the postarrest, post-*Miranda* time period. Since that time, this court has had additional occasions to consider *Doyle*, and it has not precluded the admissibility of pre-*Miranda* silence. See, e.g., *Woods, supra*; *State v. Myers*, 244 Neb. 905, 510 N.W.2d 58 (1994), *overruled on other grounds, State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998); *State v. Wells*, 229 Neb. 89, 425 N.W.2d 338 (1988); *State v. Lofquest*, 227 Neb. 567, 418 N.W.2d 595 (1988). See, also, *State v. Duis*, 207 Neb. 851, 301 N.W.2d 587 (1981). We agree with the U.S. Supreme Court that it is not a violation of fundamental fairness for the State to use a defendant's pre-*Miranda* silence as

impeachment or as substantive evidence of sanity. See, *Wainwright, supra*; *Fletcher, supra*; *Jenkins, supra*; *Thomas v. State of Ind.*, 910 F.2d 1413, 1414 (7th Cir. 1990) (admission of pre-*Miranda* silence and request for counsel as evidence of sanity "raises no problems"). Prior to a defendant's receipt of *Miranda* warnings, there is "no governmental action induc[ing] [the defendant] to remain silent before arrest." *Jenkins*, 447 U.S. at 240. We therefore limit our analysis to evidence elicited by the State at trial referring to Harms' post-*Miranda* silence.

Harms challenges portions of the testimony given by five witnesses at trial: Plager, Dr. Logan, Dr. Roy, White, and Adams. Harms contends that the district court, in admitting this testimony, considered Harms' silence as evidence of *both* his guilt and sanity. The district court's responses to Harms' objections based on *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), however, do not support Harms' contention that such evidence was considered by the court as evidence of his guilt. In response to Harms' first *Doyle* objection, the district court stated:

> Well, I'm going to overrule the objection and enter a finding that I feel that he's waived that particular right based on his affirmative defense presented to the Court at this time period and this is basically now being brought in for a limited purpose. And the limited purpose of the State is bringing this particular point in for the question of his sanity, so overruled on the objection.

Later, in response to another objection by Harms, the district court stated, "[A]s the Court indicated, I'm receiving it for a limited purpose and that's to determine insanity and not to prove his guilt or innocence as regarding that particular right that he has." The record clearly demonstrates that the district court's sole purpose in receiving testimony regarding Harms' silence and requests for counsel was to aid the court in determining whether Harms was sane at the time of the shooting. It was not used as substantive evidence of Harms' guilt. Therefore, the allegation that the district court used Harms' silence as evidence of his guilt is without merit. We thus analyze the testimony of each witness solely to determine whether the district court improperly considered Harms' silence as substantive evidence of his sanity.

## (a) Plager

Plager's telephone conversation with Harms took place before Harms was arrested and had received *Miranda* warnings. Therefore, pursuant to *Wainwright v. Greenfield*, 474 U.S. 284, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986), Plager's testimony regarding her conversation with Harms, including Plager's references to Harms' requests for his attorney, was admissible.

## (b) Dr. Logan

During recross-examination, defense counsel objected on the basis of *Doyle* to the State's attempt to elicit Dr. Logan's opinion regarding Harms' mental state at the time Harms called the dispatcher and requested his attorney. The district court overruled the objection and allowed Dr. Logan to testify as follows:

[Prosecution:] When Russell Harms called 911 after the shooting and he returned to his mobile home and asked for his attorney, have you expressed an opinion as to whether he was sane or insane at this time?

. . . .

[Dr. Logan:] In terms of making an opinion determination on his sanity, I don't know how the criteria of nature and quality and lawfulness of his actions would be to call an attorney. I don't know how to answer this. But whether this was a product of his mental illness or not, I did not ask him specifically the reasons for him calling the attorney afterwards, but noted that he often went to his attorney with some of his ideas that people were harassing him and stealing things from his trailer and ideas about the t.v. or they were making comments about his behavior.

Q Doctor, thank you. So the fact that he drives over to his trailer, calls 911 and makes the comment that he makes, is that significant to you or is it not?

A It's significant to me.

Q Does it indicate a period then that he knows what he is doing?

A He certainly knows in the same way that he knew he was shooting a gun at Mr. Kelsay. He knew what he was doing. He certainly knew the number he was dialing. It doesn't tell me that he was thinking rationally about it at

that time or that it was done with any kind of clear recognition of the situation.

Q It doesn't tell you that if he was acting rationally or not because you didn't inquire of that with him, did you?

A I didn't inquire of him about the 911 conversation, but I inquired about the events of that morning. I asked him about—

Q You have said that several times. Please just answer the question. You didn't inquire of him concerning his dialing 911?

A Right. I did not inquire about that call.

The record shows that the subject matter of the State's questions and Dr. Logan's comments did not extend beyond Dr. Logan's interpretation of Harms' telephone call to the dispatcher and Harms' requests for his attorney during the telephone call. Since Harms' requests for his attorney while speaking with the dispatcher clearly occurred in the prearrest, pre-*Miranda* time period, Dr. Logan's statements were admissible. See *Wainwright, supra.*

### (c) Dr. Roy

As the State was preparing to call Dr. Roy to testify at trial, defense counsel objected to any questioning of Dr. Roy that would violate *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). The court overruled the objection and permitted Dr. Roy's testimony. Dr. Roy testified regarding Harms' prearrest, pre-*Miranda* call to the dispatcher and his requests for counsel at that time. As previously noted, such testimony was properly admitted under *Wainwright.*

However, Dr. Roy also testified regarding Harms' refusal to speak with police officers after receiving *Miranda* warnings. Dr. Roy stated, "[W]hen he was explained his Miranda rights, he said, 'I'm not going to talk without my lawyer.' " This statement by Dr. Roy commented on Harms' post-*Miranda* silence and was thus inadmissible as evidence of Harms' sanity pursuant to *Wainwright v. Greenfield*, 474 U.S. 284, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986).

In addition, Dr. Roy's written psychiatric evaluation was admitted as an exhibit at trial. The written evaluation stated in part:

Mr. Harms refused to talk to the police officer without the present [sic] of his lawyer. This also was suggestive that he knew the role of his lawyer and the consequences of the alleged offense. Mr. Harms did understand the nature of what he was doing and he did know the difference between right and wrong with respect to what he was doing.

While these portions of Dr. Roy's evaluation utilized Harms' post-*Miranda* silence as evidence of sanity, counsel did not object to their admission. When the State offered the evaluation as an exhibit, defense counsel stated, "No objection, Judge." As a result, Harms has waived his "right on appeal to assert prejudicial error concerning the evidence received without objection." *State v. Harris, ante* p. 331, 339, 640 N.W.2d 24, 33 (2002).

### (d) White

White testified at trial regarding his communications with the dispatcher as he was stationed in front of Harms' trailer. White testified that the dispatcher had advised him that Harms was on the telephone requesting an attorney. As discussed *supra*, these conversations and events occurred pre-*Miranda* and were properly admitted under *Wainwright*.

The State, however, also asked White how Harms had reacted after being arrested and receiving the *Miranda* warnings. The following dialog occurred at trial:

[Prosecution:] Did [Harms] say anything to you at that time?

[White:] Officer Adams— we did what they call a— like a felony arrest situation. He gave the commands, had him walk out towards him and go down to the asphalt. I came around and handcuffed him and verbally gave him his Miranda rights. And at that time he asked for an attorney.

[Defense counsel]: Your Honor, I'm going to renew my objection again regarding commenting about his right to remain silent and Miranda warnings and him invoking his right to remain silent.

[Court]: All right. Overruled. You may proceed.

[White:] I advised him, verbally advised him of his Miranda rights. He asked for Mr. Cain. I told him we would get Mr. Cain and put him in the cruiser and took him to the law enforcement building.

Q .... Now, Mr. Cain, who do you understand that to be?
A That's his attorney or was his attorney. . . .
. . . .

Q So what period of time were you with Russell Harms on the date in question, December 10?
A From the time the arrest was made until he was locked in the jail.
. . . .

Q At any time that you were with him on that date, did Mr. Harms indicate to you that he was hearing any command voices?
A No, sir.
Q Did he indicate to you that he was having any hallucinations of any kind?
A No, sir.

The State's questions to White elicited testimony about Harms' post-*Miranda* requests for his attorney and his failure to speak with police officers regarding his mental state. When the police officers gave Harms his *Miranda* warnings, they gave him an "implicit promise" that his decision to remain silent or request his attorney would not be used to penalize him. See *Wainwright v. Greenfield*, 474 U.S. 284, 292, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986). However, by commenting on this silence at trial, the State "breach[ed] that promise by using silence to overcome [Harm's] plea of insanity." See 474 U.S. at 292. We determine, therefore, that the above portions of White's testimony which discussed Harms' post-*Miranda* silence were inadmissible and error pursuant to *Wainwright*.

(e) Adams

*(i) Testimony Regarding 1999 Arrest*

Adams' testimony at trial was very similar to White's description of Harms' post-*Miranda* behavior. In its examination of Adams, the State elicited from Adams the fact that Harms, after receiving *Miranda* warnings, requested his attorney and did not mention anything about hearing voices or having hallucinations. However, Harms did not object to Adams' testimony. Although all *Wainwright* errors were properly preserved by Harms in similar testimony by White, such objection

made during White's testimony does not preserve the objection as to Adams' testimony.

Where an objection has once been made to the admission of testimony and overruled by the court, it is unnecessary to repeat the same objection to further testimony of the same nature by the same witness in order to preserve alleged error in the admission of the testimony to which the objection was made. *State v. Kirksey*, 254 Neb. 162, 575 N.W.2d 377 (1998). Adams' testimony at trial was of the "same nature" as White's testimony, but Adams was not the "same witness." Thus, it was necessary for Harms to object to any alleged error in Adams' testimony in order to properly preserve it for appeal. See *id.* "A party who fails to make a timely objection to evidence waives the right on appeal to assert prejudicial error concerning the evidence received without objection." *State v. Harris, ante* p. 331, 339, 640 N.W.2d 24, 33 (2002). Since Harms did not object to Adams' testimony, we determine that Harms has waived the right to assert prejudicial error regarding Adams' testimony on appeal.

### (ii) Testimony Regarding 1994 Arrest

Harms also argues that it was a violation of *Wainwright* for the court to admit evidence at trial of Harms' silence following a prior arrest by Adams in 1994. The challenged testimony, which was initiated by Harms' counsel, is as follows:

[Defense counsel:] When you contacted [Harms] in 1994 regarding the assault, did Mr. Harms indicate to you that he thought he was being falsely arrested?

[Adams:] No, because— can I go on? Our policy is contact, interview, if you believe there's an arrest. He was read his rights and he was not willing to talk to me without the services of an attorney.

Q All right, thank you. No further questions.

Harms' allegation is without merit because defense counsel elicited the response from Adams. While the State, in its direct examination of Adams, initiated the questioning regarding the 1994 arrest of Harms, the State did not inquire into Harms' post-*Miranda* silence at the time of that arrest. The State asked Adams whether Harms' "behavior was different at that time than other times that you have seen him." Adams responded that Harms was

"somewhat upset" and "angry" during the 1994 arrest. Such questioning is permissible under *Wainwright* because it "avoided any mention of the defendant's exercise of his constitutional rights to remain silent and to consult counsel." *Wainwright v. Greenfield*, 474 U.S. 284, 295, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986).

▮ A defendant in a criminal case may not take advantage of an alleged error which the defendant invited the trial court to commit. *State v. Dunster*, 262 Neb. 329, 631 N.W.2d 879 (2001). Also, one may not waive an error, gamble on a favorable result, and, upon obtaining an unfavorable result, assert the previously waived error. *State v. Trotter*, 262 Neb. 443, 632 N.W.2d 325 (2001). For the foregoing reasons, we determine that Adams' testimony describing Harms' silence during a 1994 arrest was properly admitted.

### 3. HARMLESS ERROR

▮ Having determined that portions of the testimony of Dr. Roy and White were improperly admitted pursuant to *Wainwright*, the issue becomes whether the erroneously admitted evidence is harmless. In this court's prior cases analyzing *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), we have stated that " '[b]ecause the nature of a *Doyle* error is so egregious and so inherently prejudicial, reversal is the norm rather than the exception.' " *State v. Lofquest*, 227 Neb. 567, 571, 418 N.W.2d 595, 597 (1988), quoting *Williams v. Zahradnick*, 632 F.2d 353 (4th Cir. 1980). However, *Doyle* and *Wainwright* violations constitute "trial error" and are subject to a harmless error analysis. *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). See, also, *Lofquest*, 227 Neb. at 570-71, 418 N.W.2d at 597 (applying " ' "harmless beyond a reasonable doubt" standard to *Doyle* violations' ").

▮ Generally, " 'erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.' " *State v. Ildefonso*, 262 Neb. 672, 686, 634 N.W.2d 252, 265 (2001). At Harms' trial, the trier of fact was the district court. In such a context, this court has stated:

> In a bench trial of a law action, including a criminal case tried without a jury, erroneous admission of evidence is not

> reversible error if other relevant evidence, admitted without objection or properly admitted over objection, sustains the trial court's factual findings necessary for the judgment or decision reviewed; therefore, an appellant must show that the trial court actually made a factual determination, or otherwise resolved a factual issue or question, through the use of erroneously admitted evidence in a case tried without a jury. . . . The appellant must show that the trial court made a finding of guilt based exclusively on the erroneously admitted evidence. . . . If there is other sufficient evidence to support the finding of guilt, the conviction will not be reversed.

*State v. Lara*, 258 Neb. 996, 1002, 607 N.W.2d 487, 491-92 (2000). We examine the evidence and the district court's findings in accordance with these standards. Therefore, the issue is whether the district court resolved the question of Harms' sanity exclusively through the use of the impermissible testimony of Dr. Roy and White. If the record contains other sufficient evidence to support the district court's finding that Harms was sane beyond a reasonable doubt, the conviction will not be reversed. In Nebraska, the test of responsibility for crime is a defendant's capacity to understand the nature of the act alleged to be criminal and the ability to distinguish between right and wrong with respect to the act. *State v. Smith*, 256 Neb. 705, 592 N.W.2d 143 (1999). For an insanity defense, the insanity must be in existence at the time of the alleged criminal act. *Id.*

We begin our analysis by examining those portions of the testimony of Dr. Roy and White that were inadmissible pursuant to *Wainwright v. Greenfield*, 474 U.S. 284, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986). Erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact. *Ildefonso, supra*. Dr. Roy's testimony that "when [Harms] was explained his Miranda rights, he said, 'I'm not going to talk without my lawyer,' " is essentially identical to the statement in Dr. Roy's written evaluation, admitted without objection, that "Mr. Harms refused to talk to the police officer without the present [sic] of his lawyer." Accordingly, we find Dr. Roy's testimony cumulative. Similarly, White's testimony

regarding Harms' post-*Miranda* requests for counsel and failure to mention anything about hearing voices or having hallucinations is repeated without objection in Adams' testimony, which provides virtually the same answers to the same questions posed by the State. Because of this repetition, we also find White's testimony cumulative.

Since the inadmissible portions of the testimony of Dr. Roy and White are cumulative, we must determine next whether " 'other relevant evidence, properly admitted, supports the finding by the trier of fact.' " See *State v. Ildefonso*, 262 Neb. 672, 686, 634 N.W.2d 252, 265 (2001). At trial, the State offered a substantial amount of evidence regarding Harms' sanity. Several individuals testified to Harms' calm demeanor immediately after the shooting. Clark, an eyewitness to the shooting, stated that Harms drove away after the shooting at a normal rate of speed and was "[n]ot [in] a real big hurry." Hatten, another eyewitness, also testified that Harms did not hurry to leave the area after shooting Kelsay, but, rather, drove away "[s]low, deliberate, like watching." Both White and Adams, the police officers, described how Harms behaved calmly, normally, and without agitation at the time of his arrest. Adams specifically noted that Harms' "normal" demeanor on the day of the shooting differed significantly from an angry encounter Adams had had with Harms in 1994. Plager, the dispatcher, discussed how Harms was not excited or agitated when she spoke with him after the shooting, and how he had asked for his attorney without any mention of hallucinations or command voices.

Dr. Roy's statements at trial and in his written evaluation of Harms, excluding inadmissible portions in violation of *Wainwright*, also provided the court with evidence of Harms' sanity at the time of the shooting. Dr. Roy found that Harms' thoughts prior to the shooting, such as " 'this old guy looks like he had a lot of good years,' " were distinguishable from command voices ordering Harms to kill someone. He testified that when he interviewed Harms, Harms denied "any auditory hallucination, delusional thinking, or any paranoia related to" Kelsay because "he has no connection with that man."

Dr. Roy also compared the behavior of someone who was actively hallucinating with Harms' behavior on the day of the

shooting. Dr. Roy testified that an individual in Harms' circumstance who was actively hallucinating or experiencing delusions would have exhibited "bizarre" behavior, such as engaging in a random shooting spree with multiple victims or driving at an extremely high rate of speed, and would have been incapable of acting rationally. Dr. Roy contrasted this scenario with Harms' actions, specifically, Harms' ability to slowly drive to his trailer, pick up the telephone, dial 911, speak with the dispatcher, and ask the dispatcher for his attorney. In sum, Dr. Roy testified that a person who was actively hallucinating could not have behaved the way Harms did after the shooting. Dr. Roy further testified that Harms' call to the dispatcher with a request for his attorney demonstrated that Harms knew that shooting Kelsay was wrong and would subject him to legal proceedings.

In addition, portions of the testimony offered by Dr. Logan, Harms' expert witness, support a finding of sanity. Dr. Logan stated that Harms, in shooting Kelsay, "knew he was firing a gun," "knew he was shooting an elderly gentleman," and was acting with deliberation and premeditation "[t]o the extent that he had to take out a rifle and shoot him numerous times." Dr. Logan also concluded that Harms "knew what he was doing" and "certainly knew the number he was dialing" when he called 911 with a request for his attorney.

The district court in its findings does not refer to Harms' post-*Miranda* silence, either as a basis for its finding of sanity or for any other purpose. The court stated:

There's two elements in the insanity defense, and one being that defendant had a mental disease, defect, disorder at the time that the act is charged. Again, the State concedes that, at least as to this part of the defense, the defendant has that particular disorder. That would be the schizophrenia of paranoid type.

We get into the next part of that and that is that— and which means not only do you have to prove that the person has that particular disease, but the defense must also show that the mental disease, the paranoid schizophrenia impaired his mental capacity to such an extent that either (1) he did not understand the nature or consequences of what he was doing or (2) that he did not know that— he did not know the

difference between right or wrong with respect to what he was doing.

Now, either one of those has to be proved by the greater weight of the evidence. And if that's the case, the defense has met their burden of proving by preponderance of the evidence that he was insane. Like most of these cases, you have two experts with credentials coming into this room and they both give opposite opinions. And, of course, it has to be confusing to the lay witnesses from the standpoint that how two professionals can come up with two different types of opinion. On the other hand, I think it's pointed out by [defense counsel], his expert relied heavily— remember there was actually— well, they talked about four particular phases which didn't include the interview but they talked about his history prior to the actual incident and then the actions thereafter as part of the mix in making their determination regarding his— the issue of his knowing the nature and consequences of what he was doing or the difference between right and wrong.

Again, I know that Dr. Logan emphasized strongly the historical pattern up to the shooting which would leave a basis for his opinion as to the actual, you know, state of mind of the defendant at the time of the shooting. Now, we know the actions of the defendant at the time based on the evidence that's been submitted. And we don't know what was going on in his mind and that's the problem the Court has. Okay, we've got— somebody's got to make a decision as to what was going on in his mind at the time. We know his actions thereafter and, of course we know the cliches are brought about because they're generally there for all of us to hear, like the cliche actions speak louder than words. What he did do at the time, what he did do thereafter and, of course, [defense counsel] is saying what have we also got in the beginning of this, also to look from the standpoint of his actions, Judge, also to consider it.

There's no question that he did have a history of some delusions. And it seems like the historical pattern— now [defense counsel]'s explaining the reason and maybe given the facts and reason, he didn't— Well, let me go back here.

The historical pattern seems to suggest that when Mr. Harms had a problem and felt a— whatever he called that, anxiety coming on, he usually was able to control it to some extent and maybe it was his own feeling that the mental professionals had let him down, to not help himself any further, I don't know.

But it seems like from the history that was given, that throughout that history he was constantly telling them that he had these hallucinations or delusions and yet what I note in this particular case is, is that even Dr. Logan testified that there were no command voices that he was given at the time of the incident. And yet he, for whatever reason, he said he didn't know whether— said he believed he was— he said he was guarded. One's left to speculate as to what was going on in his mind. It's odd to me that the person that's been able to talk about all these voices all of a sudden, you know, does not— clams up when it comes to a particular factual pattern that's now very serious now confronting him.

Even after time passes he's not communicating that at least to the satisfaction of the doctor. I know that Dr. Roy on the other hand disregarded the historical context and didn't put as much weight on it and put more weight on the actual incident and he weighed also, I'm sure, his actions thereafter.

To be quite honest with both parties, it's the Court's opinion that both these professionals have left me with a lot more questions than I have answers for. And I guess what I'm saying to the defendant is that I do not believe you met your burden you have of proving yourself insane even by the greater weight of the evidence.

Given the court's findings and the admissible evidence as evaluated in this opinion, we determine that the district court did not resolve the issue of Harms' sanity "based exclusively on the erroneously admitted evidence." See *State v. Lara*, 258 Neb. 996, 1002, 607 N.W.2d 487, 492 (2000). We find that the erroneously admitted testimony of Dr. Roy and White in violation of *Wainwright v. Greenfield*, 474 U.S. 284, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986), is cumulative to other relevant and properly

admitted evidence regarding Harms' sanity. Furthermore, we find that the properly admitted evidence contained in the record is sufficient to support the district court's finding that Harms was not insane at the time of the shooting. For these reasons, we determine that the *Wainwright* errors which occurred at trial were harmless beyond a reasonable doubt.

### 4. INSANITY DEFENSE

In his second assignment of error, Harms argues that the district court erroneously concluded that he was not insane at the time of the shooting.

> Nebraska follows the *M'Naghten* rule as to the defense of insanity. The test of responsibility for crime is a defendant's capacity to understand the nature of the act alleged to be criminal and the ability to distinguish between right and wrong with respect to the act. . . . For an insanity defense, the insanity must be in existence at the time of the alleged criminal act.

(Citation omitted.) *State v. Smith*, 256 Neb. 705, 710, 592 N.W.2d 143, 147 (1999). A defendant who pleads that he or she is not responsible by reason of insanity has the burden to prove the defense by a preponderance of the evidence. See § 29-2203.

It is undisputed that Harms is a paranoid schizophrenic with a long history of mental illness, failed medications, and hospitalizations. However, the fact that a defendant has some form of mental illness or defect does not by itself establish insanity. See, *State v. Lesiak*, 234 Neb. 163, 449 N.W.2d 550 (1989); *State v. Lamb*, 213 Neb. 498, 330 N.W.2d 462 (1983).

As discussed previously, two eyewitnesses, two police officers, and a dispatcher testified at trial regarding their encounters with Harms' calm and normal demeanor after the shooting. Dr. Logan, Harms' expert, and Dr. Roy, the State's expert, presented opposing opinions as to Harms' sanity. Both experts submitted detailed written evaluations of Harms based on their examination of his medical records and their individual meetings with him.

The verdict of the finder of fact on the issue of insanity will not be disturbed unless there is insufficient evidence to support such a finding. *State v. Ryan*, 233 Neb. 74, 444 N.W.2d 610 (1989). Also, an appellate court does not resolve conflicts in evidence,

pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented, which are within a fact finder's province for disposition. *State v. Campbell*, 260 Neb. 1021, 620 N.W.2d 750 (2001). This court will not reevaluate the testimony of Dr. Roy or Dr. Logan, or reweigh such testimony against the testimony of others at trial. We conclude that the issue of sanity was fairly presented to the district court and that the record contains sufficient admissible evidence for the finder of fact to conclude that Harms was not insane at the time of the shooting. See *Ryan, supra.* Harms' second assignment of error is without merit.

## 5. First Degree Murder

In his final assignment of error, Harms argues that the district court erred in interpreting and applying the elements of first degree murder. In enumerating its findings of fact, the district court stated:

> The Court has reviewed the evidence. And pursuant to the fact-finder's deliberations, normally the first course would be to go through each one of these elements and make sure that the State has presented evidence regarding that. And the first count being that on December 10, 1999, Russell W. Harms in the County of Nemaha and State of Nebraska, did then and there kill Tennyson E. Kelsay purposely and with deliberate and premeditated malice. Those are the separate elements. There's been no dispute regarding those facts except in the case of Dr. Logan's testimony earlier that, well, deliberation, premeditation, he may have had; but it was not rational.
>
> Deliberation is defined under our law and that is not suddenly or rationally [sic] but after first considering the probable consequences. . . .
>
> . . . I don't think that Nebraska law says that your deliberate premeditation has to be rational. I'm not quite sure that's a relative term. If there's any way you're going to define it, that's probably back in the affirmative defense of insanity.

The elements of first degree murder are listed in Neb. Rev. Stat. § 28-303 (Reissue 1995), which states, "A person commits murder in the first degree if he kills another person (1)

purposely and with deliberate and premeditated malice . . . ." Accord *State v. McLemore*, 261 Neb. 452, 623 N.W.2d 315 (2001). Relying on *State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990), *disapproved on other grounds, State v. Messersmith*, 238 Neb. 924, 473 N.W.2d 83 (1991), Harms argues that Nebraska law requires the trier of fact to find that a defendant's deliberation and premeditation were rational. He asserts:

> The lesson of *Reynolds* is that the State bears the burden of proving first degree murder and its essential elements of rational, intentional consideration of the probable consequences. The trial court never considered the possibility that the State had not proven these elements beyond a reasonable doubt. The evidence at trial is to the effect that Mr. Harms lacked the rational, intentional consideration of the probable consequences to meet the elements of first degree murder.

Brief for appellant at 48.

Based on this argument that "rational" intent is a required element of first degree murder, Harms argues that the district court erred in impermissibly placing the burden of proving "rational" premeditation and deliberation on him as part of his insanity defense. He further maintains that since the State did not prove that his premeditation and deliberation were rational, there was insufficient evidence to convict him of first degree murder and use of a deadly weapon to commit a felony.

This court has determined that "deliberate" means not suddenly, not rashly, and requires that the defendant considered the probable consequences of his or her act before doing the act. See *State v. McBride*, 250 Neb. 636, 550 N.W.2d 659 (1996). We have also determined that one kills with "premeditated malice" if, before the act causing the death occurs, one has formed the intent or determined to kill the victim without legal justification. *Id.* The time required to establish premeditation may be of the shortest possible duration and may be so short that it is instantaneous, and the design or purpose to kill may be formed upon premeditation and deliberation at any moment before the homicide is committed. *Id.*

A fundamental principle of statutory construction requires that penal statutes be strictly construed. *State v. Hamik*, 262 Neb. 761, 635 N.W.2d 123 (2001). We find nothing in

§ 28-303 or in this court's interpretation of § 28-303 which requires that a defendant must *rationally* consider the probable consequences of his or her actions or *rationally* determine to kill the victim without legal justification. See, e.g., *McLemore, supra*; *McBride, supra*; *Reynolds, supra*. Therefore, in stating its findings, the district court did not err in determining that "rational" was not a required element of "premeditation" or "deliberation." As a result, we also find that the district court did not impermissibly shift the burden of proof to Harms or err in finding that there was sufficient evidence to convict Harms of first degree murder and use of a deadly weapon to commit a felony. We determine that this assignment of error is without merit.

## VI. CONCLUSION
For the foregoing reasons, Harms' convictions are affirmed.

AFFIRMED.