STATE OF NEBRASKA, APPELLEE, V.
ERIC T. MCGHEE, APPELLANT.
742 N.W.2d 497

Filed December 14, 2007.    No. S-06-1332.

Thomas C. Riley, Douglas County Public Defender, and Timothy P. Burns for appellant.

Jon Bruning, Attorney General, and James D. Smith for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

HEAVICAN, C.J.

## INTRODUCTION

Eric T. McGhee was convicted of first degree murder and use of a weapon to commit a felony. On appeal, McGhee contends there was insufficient evidence to support a conviction for first degree murder and that he was not responsible by reason of insanity.

## FACTS

*Procedural Background.*

On March 11, 2003, McGhee was charged with first degree murder and use of a weapon to commit a felony in the death of Ezra Lowry. That same day, McGhee's counsel filed a motion to determine competency. Following a mental competency evaluation at the Lincoln Regional Center, McGhee was found not competent to stand trial. Periodic reviews were held with regard to McGhee's status, and on February 10, 2006, the court found that McGhee's competency had returned. On May 15, McGhee notified the court that he intended to plead not responsible by reason of insanity.

A jury trial was held from August 14 to 17, 2006. At trial, McGhee did not contest that he shot Lowry; rather, his theory of defense was that his actions did not amount to first degree

murder. Thus, McGhee contended that a conviction for second degree murder would be more appropriate and that in any case, he was not responsible by reason of insanity. The jury rejected these claims and found McGhee guilty of first degree murder and use of a weapon to commit a felony. On October 25, the district court denied McGhee's motion for a new trial and sentenced him to life imprisonment for first degree murder and 5 to 10 years' imprisonment for use of a weapon to commit a felony.

*Events of January 29 and 30, 2003.*

The events surrounding Lowry's death were presented primarily through the testimony of Jermaine Dunn and Nadeena Washington. McGhee, Dunn, Lowry, and Washington were good friends who frequently socialized together. From the testimony presented at trial, all smoked marijuana and drank alcohol. In addition, both Dunn and McGhee had a history of smoking "wet," a marijuana cigarette dipped in formaldehyde that has been cut with a drug known as PCP.

During the daylight hours of January 29, 2003, the four, along with Lowry's uncle and McGhee's cousin, were at McGhee's home in Omaha drinking and smoking marijuana. Washington testified that she and Lowry had been invited over by McGhee and that when they arrived with Dunn and Lowry's uncle, McGhee seemed upset. The party broke up approximately 30 to 45 minutes later.

Later that evening, Lowry and Washington, along with their 4-year-old son, picked up Dunn and returned to McGhee's home. Upon arrival, they observed McGhee involved in a physical altercation with his girlfriend. Though the evidence is not definitive, it appears that Lowry broke up the fight, the girlfriend left, and the others went inside. Washington testified that the girlfriend continued to telephone McGhee at his home throughout the evening.

The party went on for 2 to 3 hours before McGhee and Washington left to purchase alcohol. According to Washington's testimony, in the 15 minutes she and McGhee were out, they had a conversation in which McGhee implied that he was God.

Upon their return, McGhee and Washington resumed a game of dominoes they had been playing, while Dunn and Lowry played pool. All were drinking and smoking marijuana, and at one point, another acquaintance stopped by for a brief visit. Washington and Dunn testified that there had been no arguments or disagreements between McGhee and Lowry that evening, though Dunn indicated that Lowry had initially expressed displeasure that Washington was going with McGhee to purchase alcohol. Both Washington and Dunn also testified that McGhee had been acting strange recently, including during the course of that evening. In particular, Dunn testified that about 5 minutes before Lowry was shot, McGhee had acted "bizarre," pacing around and briefly going outside. Both Dunn and Washington blamed McGhee's general behavior on smoking "wet," although there is no evidence that he was smoking "wet" on this particular evening. In addition, both Dunn and Washington testified that prior to the shooting, neither had seen a gun that evening.

At some point before Lowry was shot, Washington fell asleep on the couch. Lowry ultimately woke her so the couple and their son could leave, but McGhee talked them out of leaving by producing a large bag of marijuana, and Washington went back to sleep. According to Dunn, McGhee tried to get Washington to roll him a "blunt," but she was still sleeping. McGhee refused to let Lowry do it, so Dunn left the room to do it instead.

Dunn testified that he was in the back room when the music suddenly got "concert loud." Dunn then heard a gunshot. Upon returning to the main room, Dunn saw McGhee pointing a gun at him and Lowry lying on the floor.

At about this time, Washington was awakened by her son, who told her that McGhee had hit Lowry with a pool stick and that Lowry was bleeding. McGhee then pointed the gun between Dunn and Washington. While McGhee indicated that he would not shoot them, he nevertheless chased Dunn around the house.

Dunn escaped through the front door, which he and Washington both testified was locked, though it had not been locked earlier in the evening. As he escaped out the front door, Dunn testified he heard another gunshot. Washington testified

that this gunshot was McGhee's shooting Lowry a second time. She also testified that after McGhee shot Lowry the second time, he turned to Washington and said, "I saved you."

Dunn testified that after he left the house, he saw McGhee walk out onto the front porch of the home, but that McGhee did not appear to see Dunn. Dunn then used a nearby pay telephone to call the 911 emergency dispatch service. Dunn waited for police, directing them to McGhee's home upon their arrival.

When McGhee left the house to look for Dunn, Washington locked the front door behind him. Washington testified that she attempted to call 911 using McGhee's telephone, but found that it had been unplugged. Washington then found Lowry's cellular telephone in his pocket and called 911. Meanwhile, McGhee kicked the door in and reentered the house. He took the telephone from Washington, then pointed the gun at Washington and demanded her car keys, which Washington could not find.

McGhee then forced Washington and her son out of the front door of the house and around to the back alley. McGhee then led them on what Washington described as a "zig-zag" path for about a mile. During this time, McGhee stopped to hide when he heard police sirens and kept saying that the victim was "bad" and "not pure" and that he should have killed Dunn as well. Washington also testified that McGhee kept asking her questions about her son, implying that he, McGhee, was the child's father and that he and Washington had been involved in a sexual relationship. Washington testified that this was not true. At one point, McGhee disposed of Dunn's and Lowry's cellular telephones, but soon after retrieved Lowry's telephone. He then used the telephone to call someone to tell him or her that they were coming. Throughout this walk, McGhee had the gun with him and often insisted on carrying Washington's son.

Eventually, the three arrived at McGhee's aunt's home. McGhee again turned the music up, but allowed Washington to use Lowry's cellular telephone to call for a ride. At some point, McGhee's aunt came downstairs. According to Washington, she told the aunt that McGhee had killed Lowry, which McGhee then denied. In contrast, the aunt testified that Washington simply told her that she and her son were waiting for a ride. In any event, the ride arrived and Washington and her son left.

According to Washington, they left the aunt's home sometime between 2 and 3 a.m. on January 30, 2003.

After Washington and her son left, McGhee indicated that he was also leaving. He returned to the aunt's home at about 6 a.m. and went to sleep. Eventually, the police determined his whereabouts, surrounded the home, and took McGhee into custody. The weapon used to kill Lowry was never recovered.

*Testimony With Regard to McGhee's Mental State.*

Dr. Bruce Gutnik testified for McGhee. Gutnik testified that he evaluated McGhee for approximately 1½ hours and diagnosed him with paranoid schizophrenia with a history of alcohol and cannabis abuse and possible dementia. Gutnik testified that in his opinion, McGhee did not know the difference between right and wrong at the time McGhee shot Lowry. Gutnik additionally testified that he thought McGhee probably did understand that by pointing a gun at Lowry's head and pulling the trigger, Lowry would be severely injured and probably killed, but that McGhee believed he was acting in self-defense. Gutnick also testified that McGhee's actions in evading police, disposing of evidence, and denying responsibility were not inconsistent with the conclusion that McGhee did not know right from wrong. Gutnik reasoned that McGhee had been psychotic and that one should not read too much into McGhee's thought process, as it was not likely to be logical or rational.

Gutnik testified about allegations that McGhee might have been malingering, or faking his symptoms, in order to delay or prevent his return to competency and later for purposes of the insanity defense. According to his testimony, Gutnik did not believe that McGhee was malingering. Gutnik also testified that smoking "wet" could cause delusions and hallucinations, but that those effects should wear off within 6 to 8 hours.

Dr. Louis Martin, a psychiatrist with the Lincoln Regional Center, testified for the State. Martin had been McGhee's treating psychiatrist for at least 2 years during the time when McGhee had been committed pending his return to competency. Martin's initial diagnosis of McGhee was that McGhee suffered from schizophrenia with a history of substance abuse.

In contrast to Gutnik, Martin testified that at the time McGhee shot Lowry, McGhee understood both what he was doing and the nature of his act, and that in spite of McGhee's mental illness, Martin felt McGhee had a basic understanding that what he had done was wrong. Martin felt that McGhee's behavior after the commission of the murder was not "indifferent" and suggested that McGhee was aware that his earlier actions were wrong.

In addition, Martin testified that both he and his staff had had concerns about malingering, notably based upon instances where McGhee would appear closed and noncommunicative when dealing with staff, but perfectly communicative when interacting with other patients. Martin acknowledged that it was difficult to determine where malingering ends and mental illness begins.

## ASSIGNMENTS OF ERROR

McGhee assigns that the district court erred in concluding (1) that there was sufficient evidence to support his conviction for first degree murder and (2) that he was sane at the time of the commission of the murder.

## STANDARD OF REVIEW

■ Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.[1]

---

[1] *State v. White*, 272 Neb. 421, 722 N.W.2d 343 (2006).

■ The verdict of the finder of fact on the issue of insanity will not be disturbed unless there is insufficient evidence to support such a finding.[2]

## ANALYSIS

*Sufficiency of Evidence.*

■ McGhee first argues that the district court erred in concluding there was sufficient evidence to support his conviction for first degree murder. The elements of first degree murder are listed in Neb. Rev. Stat. § 28-303 (Cum. Supp. 2006), which states that a person commits murder in the first degree if he or she kills another person purposely and with deliberate and premeditated malice. McGhee argues the evidence does not support a finding that the killing was done with deliberate and premeditated malice.

■ Deliberate means not suddenly, not rashly, and requires that the defendant considered the probable consequences of his or her act before doing the act.[3] The term "premeditated" means to have formed a design to commit an act before it is done.[4] One kills with premeditated malice if, before the act causing the death occurs, one has formed the intent or determined to kill the victim without legal justification.[5] No particular length of time for premeditation is required, provided that the intent to kill is formed before the act is committed and not simultaneously with the act that caused the death.[6] The time required to establish premeditation may be of the shortest possible duration and may be so short that it is instantaneous, and the design or purpose to kill may be formed upon premeditation and deliberation at any moment before the homicide is committed.[7] A question of premeditation is for the jury to decide.[8]

---

[2] *State v. Harms*, 263 Neb. 814, 643 N.W.2d 359 (2002).

[3] *State v. Robinson*, 272 Neb. 582, 724 N.W.2d 35 (2006).

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

It is apparent that the evidence, viewed in a light most favorable to the State, supports the jury's finding that McGhee had acted "purposely and with deliberate and premeditated malice."[9] There was evidence presented that McGhee had invited Washington and Lowry over to his house earlier in the day and seemed upset that they brought others with them.

McGhee later invited the couple over again and persuaded them to stay when they indicated a desire to go home. McGhee then refused to allow Lowry to roll him a "blunt" and instead had Dunn leave the room to do so. This could have been seen as an attempt to get one witness out of the room, and with Washington asleep, the only remaining witness would have been Washington's and Lowry's 4-year-old son.

After getting Dunn to leave the room, McGhee turned the music "concert loud," perhaps to mask the sound of gunshots. Then, in the aftermath of the shooting, Washington attempted to place a telephone call, yet found the telephone to be unplugged. However, according to Washington, the telephone had been ringing throughout the evening.

In addition, both Dunn and Washington testified that the front door was locked, though it had apparently not been locked earlier in the evening and several persons, including Washington and McGhee, had been outside. In fact, according to Dunn, McGhee had been outside only minutes prior to the shooting. Finally, there was testimony by both Dunn and Washington that neither had seen a gun all evening until McGhee produced one and shot Lowry.

In short, when the record is viewed in the light most favorable to the State, there is sufficient evidence to support the conclusion that McGhee committed the killing with deliberate and premeditated malice. As such, McGhee's conviction for first degree murder is supported by the record and his first assignment of error is without merit.

*Jury Finding Regarding Sanity.*

In his second assignment of error, McGhee argues the district court erred in finding that he was sane at the time

---

[9] § 28-303.

he killed Lowry. Nebraska follows the *M'Naghten* rule as to the defense of insanity. The test of responsibility for crime is a defendant's capacity to understand the nature of the act alleged to be criminal and the ability to distinguish between right and wrong with respect to the act.[10] For an insanity defense, the insanity must be in existence at the time of the alleged criminal act.[11] A defendant who pleads that he or she is not responsible by reason of insanity has the burden to prove the defense by a preponderance of the evidence.[12] The verdict of the finder of fact on the issue of insanity will not be disturbed unless there is insufficient evidence to support such a finding.[13]

Gutnik testified that in his opinion, McGhee did not know the difference between right and wrong and thought that in killing Lowry, he had done a "good deed and expected people to pat him on the back and say way to go." Gutnik further testified that while McGhee understood that putting a gun to Lowry's head and pulling the trigger would likely result in injury or death to Lowry, McGhee nevertheless thought he was acting in self-defense. Martin, on the other hand, testified that he believed McGhee knew his actions were wrong and that such was evidenced by the fact that McGhee to some extent attempted to cover up his actions.

An appellate court does not resolve conflicts in evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented, which are within a fact finder's province for disposition.[14] By rejecting McGhee's insanity defense, the jury clearly believed Martin's testimony that McGhee knew that his actions were wrong. This court will not revisit that finding.

The record contains sufficient admissible evidence for the jury to conclude that McGhee was not insane at the time he shot Lowry. As such, McGhee's second assignment of error is without merit.

---

[10] *State v. Harms, supra* note 2.

[11] *Id.*

[12] *Id.* See, also, Neb. Rev. Stat. § 29-2203 (Reissue 1995).

[13] *State v. Harms, supra* note 2.

[14] See *id.*

## CONCLUSION

There was sufficient evidence in the record to support both McGhee's conviction for first degree murder and the jury's finding that McGhee was not insane at the time he shot Lowry. As such, the judgment of the district court is affirmed.

AFFIRMED.