STATE OF NEBRASKA, APPELLEE, V.
RONNIE THURMAN, APPELLANT.
730 N.W.2d 805

Filed May 4, 2007.    No. S-06-761.

James R. Mowbray, Jerry L. Soucie, and, on brief, Nancy K. Peterson, of Nebraska Commission on Public Advocacy, for appellant.

Jon Bruning, Attorney General, and Susan J. Gustafson for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

HEAVICAN, C.J.

## I. BACKGROUND

Defendant Ronnie Thurman was charged with kidnapping, first degree sexual assault, second degree assault, and two counts of use of a weapon to commit a felony. Following a jury trial, Thurman was acquitted of kidnapping, but convicted of the lesser-included offense of first degree false imprisonment. Thurman was also convicted of first degree sexual assault, second degree assault, and two counts of use of a weapon to commit a felony. Thurman was sentenced to terms of imprisonment totaling 51 to 70 years. Thurman appeals. We moved this case to our docket pursuant to our authority to regulate the dockets of this court and the Nebraska Court of Appeals.[1] We affirm Thurman's convictions and sentences.

### 1. SEPTEMBER 12 THROUGH 13, 2005

At trial, the victim, A.W., testified that on September 12, 2005, while waiting for a friend outside a bar in Grand Island, Nebraska, she was approached by Thurman, with whom she was acquainted. A.W. and Thurman saw each other periodically

---

[1] See Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

throughout that evening. A.W. eventually drove Thurman to his apartment so that she, Thurman, and Thurman's girlfriend, Ethel Hanger, could discuss the possibility of A.W.'s selling her car to the couple.

Upon arriving at his apartment, Thurman left A.W. in the living room while he went into the bedroom to wake Hanger. Hanger then joined A.W. and Thurman in the living room where they discussed the car. Hanger apparently decided that she wanted to purchase the car and handed a bankcard to Thurman. At that point, A.W. indicated that before she sold the car, she ought to speak with the man who had purchased it for her.

According to A.W.'s testimony, at that point, Thurman returned the bankcard to Hanger and Hanger left the room. Thurman then displayed a gun and began waving it around and yelling at A.W. A.W. testified that she tried to leave the premises, but that Thurman came at her, striking the top of her head with the gun. On cross-examination, A.W. testified that Thurman hit her on the head with "his hand, but his hand was holding the gun, back-handed like." A.W. was then asked to clarify:

Q So perhaps the bottom part of his hand holding the gun hit the top of your head, is that right?

A Well, whatever it was it cut the head open.

Q Okay. You don't know if it was the hand or the gun or what it was, but your head got cut open from a blow to the head, right?

A Yeah.

After she was struck, A.W. again indicated that she wanted to leave and began fighting with Thurman in an attempt to get out of the apartment. During the fight, the gun went off. A.W. stated that at first, she continued to fight with Thurman, but soon decided to cooperate due to the fact that she was bleeding heavily.

According to A.W., during the fight, her shirt had been ripped off her body and she had suffered various scratches and injuries in addition to the cut on her head. Thurman indicated to A.W. that she should go into the bathroom and get cleaned up, as she was covered in blood. A.W. testified that Thurman assisted her in removing her remaining clothing and in cleaning some of the blood from her body.

Thurman then made A.W. go into the bedroom, where Thurman tied A.W., naked, to the bed using makeshift restraints torn from a bedsheet. According to A.W.'s testimony, she was tied to the bed for the next 7 or 8 hours. During that time, Thurman attempted to penetrate her vagina with his penis, but was unable to maintain an erection. Various other sex acts were performed on A.W., and she was forced to perform sex acts on both Thurman and Hanger.

A.W. testified that she was allowed to leave after she convinced Thurman that she was pregnant (though, in fact, she was not) and had a doctor's appointment scheduled for the morning of September 13, 2005. Before she was allowed to leave, Thurman made A.W. pose for some photographs in which A.W. appears nude or seminude. According to A.W.'s testimony, the gun was present throughout these events, and on several occasions, Thurman threatened to shoot her.

After Thurman released A.W., she first drove around in her car, then contacted friends. A.W. was eventually convinced to go to a hospital, where officials called the police.

## 2. Testimony Regarding Physical Evidence

Jennifer Galvan, a sexual assault nurse examiner at a local hospital, examined A.W. Galvan testified that A.W. had abrasions to her left shoulder, forehead, and left ankle; cuts on her head; scratches on her chest; and bruises on her left wrist. A rape kit examination was performed on A.W. According to Galvan, there was no injury to A.W.'s vagina, but that such would not be surprising if the penis did not fully penetrate the vagina. Galvan also testified that there was unlikely to be any injury from oral sex. Galvan stated that an ultraviolet light was used on A.W. to look for possible semen or saliva, but that none was detected. However, according to Galvan, if a perpetrator did not ejaculate, the lack of semen would not be unusual.

Several law enforcement officers testified with regard to a search warrant executed at Thurman's residence. Strips of fabric were found at the scene, including two strips tied to a bed, two strips on the floor near the headboard, and others found throughout the apartment. A white or off-white shirt with what appeared to be blood on it in was found in the bathroom. That shirt and a

cross necklace also found at the scene were identified by A.W. as belonging to her.

### 3. INTERVIEW WITH HANGER

Hanger was separately charged in this incident. The State offered her use immunity pursuant to Neb. Rev. Stat. § 29-2011.02 (Reissue 1995) in return for her testimony against Thurman. In exchange for the immunity, Hanger did testify at trial, but generally testified that she did not remember anything about the incident.

An investigator with the Grand Island Police Department testified regarding an interview he conducted with Hanger following the events in question. During that interview, Hanger acknowledged that A.W. was tied to the bed. Though Hanger initially stated that A.W. had asked to be tied down, she later admitted that it was not a consensual act. During the interview, Hanger also indicated that Thurman threatened to kill A.W. in order to scare her. According to the investigator's testimony, during her interview, Hanger acknowledged that she was taking the medication clonazepam, that she suffered from flashbacks, and that she had spent time at a mental health facility.

## II. ASSIGNMENTS OF ERROR

On appeal, Thurman argues, summarized and restated, that the district court erred in (1) upholding the jury verdict of guilty on two counts of use of a weapon to commit a felony, (2) finding that the evidence presented at trial was sufficient to sustain his convictions for first degree sexual assault and second degree assault, (3) denying his motions for continuance to depose Hanger and to obtain Hanger's mental health records, and (4) imposing an excessive sentence.

## III. ANALYSIS

### 1. THURMAN WAS PROPERLY CONVICTED OF USE OF WEAPON TO COMMIT FELONY

In his first assignment of error, Thurman argues that the district court erred in upholding his convictions on two counts of use of a weapon to commit a felony because the underlying felonies were general intent crimes which would not support the use charges. Thurman argues that the underlying felonies, first

degree sexual assault and first degree false imprisonment, while general intent crimes, are not intentional under *State v. Ring*[2] and *State v. Pruett*.[3] The State argues that Thurman confuses specific intent, general intent, and unintentional crimes and that only an unintentional felony would not support a use of a weapon charge.

In *Ring*, this court stated:

> The apparent purposes behind § 28-1205 [which criminalizes the use of a weapon to commit a felony] are to discourage individuals from employing deadly weapons in order to facilitate or effectuate the commission of felonies and to discourage persons from carrying deadly weapons while they commit felonies. The statute is designed to regulate the manner in which felonies are committed, i.e., with the use or possession of deadly weapons. . . . It cannot reasonably be said that § 28-1205 will dissuade a person from using a deadly weapon to commit an unintentional felony; the two concepts are logically inconsistent. Thus, in order to interpret § 28-1205 in a manner which is consistent with its objective, we hold that the language "to commit any felony," as it is used in that section, is synonymous with "for the purpose of committing any felony."[4]

We thus concluded that motor vehicle homicide was an unintentional crime that would not support a conviction for use of a weapon to commit a felony.[5] We subsequently held in *Pruett* that manslaughter due to reckless assault was also an unintentional crime which could not support a use of a weapon charge.[6]

---

[2] *State v. Ring*, 233 Neb. 720, 447 N.W.2d 908 (1989).

[3] *State v. Pruett*, 263 Neb. 99, 638 N.W.2d 809 (2002).

[4] *State v. Ring, supra* note 2, 233 Neb. at 724, 447 N.W.2d at 911 (citation omitted).

[5] *State v. Ring, supra* note 2.

[6] *State v. Pruett, supra* note 3. See, also, *State v. Rye*, 14 Neb. App. 133, 705 N.W.2d 236 (2005) (terroristic threat committed recklessly is unintentional crime).

### (a) Conviction for First Degree Sexual Assault
### Supports Use of Weapon Conviction

Thurman argues that because intent is not an element of first degree sexual assault and because a defendant is not entitled to introduce affirmative defenses to negate intent, the crime cannot be considered intentional.

■ Thurman does not dispute that first degree sexual assault is a general intent crime.[7] As a general intent crime, criminal intent is inferred from the commission of the acts constituting the elements of the crime of first degree sexual assault.[8] In order to prove general criminal intent, the State must prove beyond a reasonable doubt that the accused subjected another person to sexual penetration and overcame the victim by force, threat of force, coercion, or deception.[9]

As the State notes, while under *Ring*, a vehicle cannot be used "for the purpose of" unintentionally committing motor vehicle homicide, it would be "absurd" if a weapon could not be used "for the purpose of" subjecting another to sexual penetration through the use of force, threat of force, coercion, or deception.[10] The reasoning expressed in *Ring* simply has no application outside of the context of a purely unintentional crime. The district court did not err in concluding that first degree sexual assault would support a use of a weapon charge.

### (b) Conviction for First Degree False Imprisonment
### Supports Use of Weapon Conviction

Thurman also argues that the general intent crime of first degree false imprisonment cannot support a use of a weapon conviction. Thurman contends that to convict him of first degree false imprisonment, the State was required to show that he acted knowingly, but not that he acted intentionally.

■ As relevant to this case, Neb. Rev. Stat. § 28-314 (Cum. Supp. 2006) provides that "[a] person commits false imprisonment in the first degree if he or she knowingly restrains or

---

[7] See *State v. Koperski*, 254 Neb. 624, 578 N.W.2d 837 (1998).

[8] *Id.*

[9] *Id.*

[10] Brief for appellee at 12.

abducts another person . . . under terrorizing circumstances or under circumstances which expose the person to the risk of serious bodily injury . . . ."

"Knowingly" was defined in the jury instructions as "a perception of facts required to make up the crime and may be inferred from the facts and circumstances surrounding the act." "Intentionally" was defined in those same instructions as "willfully or purposely." The U.S. Supreme Court has held that " 'the limited distinction between knowledge and purpose has not been considered important since "there is good reason for imposing liability whether the defendant desired or merely knew of the practical certainty of the results." ' "[11] The Court also noted that " 'purpose' corresponds loosely with the common-law concept of specific intent, while 'knowledge' corresponds loosely with the concept of general intent."[12]

Given this "limited distinction," it is clear that since the State must show Thurman acted knowingly in order to show he falsely imprisoned A.W., such a requirement is an indication that first degree false imprisonment as charged in this case is a general intent crime.[13] As noted above, with a general intent crime, a showing of intent by the State is required, but may be inferred from the commission of the acts constituting the elements of the crime.[14]

For the same reasons expressed with respect to first degree sexual assault, it is clear that a conviction for first degree false imprisonment would support a conviction for use of a weapon to commit a felony. It is not inconsistent to find that a defendant could use a weapon "for the purpose of" restraining or abducting someone under circumstances which are terrorizing or which expose someone to the risk of serious bodily injury. The district

---

[11] *United States v. Bailey*, 444 U.S. 394, 404, 100 S. Ct. 624, 62 L. Ed. 2d 575 (1980).

[12] *Id.*, 444 U.S. at 405.

[13] See, *State v. Robbins*, 253 Neb. 146, 570 N.W.2d 185 (1997); *State v. Miller*, 216 Neb. 72, 341 N.W.2d 915 (1983).

[14] See *State v. Koperski, supra* note 7.

court also did not err in finding that first degree false imprisonment would support a use of a weapon conviction.

Thurman's first assignment of error is without merit.

### 2. EVIDENCE WAS SUFFICIENT TO SUPPORT CONVICTIONS FOR FIRST DEGREE SEXUAL ASSAULT AND SECOND DEGREE ASSAULT

■ In his second assignment of error, Thurman argues that the district court erred in concluding the evidence was sufficient to convict him of first degree sexual assault and of second degree assault. Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.[15]

#### (a) Evidence Was Sufficient to Support Conviction for First Degree Sexual Assault

Thurman first contends the district court erred in finding there was sufficient evidence to support his conviction for first degree sexual assault. The basis for Thurman's argument is that A.W.'s testimony was not credible, particularly given the lack of physical evidence indicating she was sexually assaulted.

Neb. Rev. Stat. § 28-319 (Reissue 1995) provides that first degree sexual assault is committed when "[a]ny person . . . subjects another person to sexual penetration . . . without consent of the victim . . . ." Neb. Rev. Stat. § 28-318(6) (Cum. Supp. 2004) defines sexual penetration as "sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any

---

[15] *State v. White*, 272 Neb. 421, 722 N.W.2d 343 (2006).

object manipulated by the actor into the genital or anal openings of the victim's body . . . ."

A.W. testified that Thurman penetrated her vagina with his penis, that he anally penetrated her, and that he forced her to perform oral sex on him. Viewed in a light most favorable to the State, A.W.'s testimony is sufficient to support Thurman's conviction for first degree sexual assault. That A.W. testified Thurman was unable to maintain an erection is inconsequential as the definition of penetration includes any "intrusion, however slight."

Moreover, Thurman's contention that A.W.'s testimony is not credible is without merit, as this court does not pass on the credibility of witnesses when assessing the sufficiency of the evidence to support a conviction.[16] Accordingly, we conclude the evidence was sufficient to support Thurman's conviction for first degree sexual assault.

### (b) Evidence Was Sufficient to Support Conviction for Second Degree Assault

Thurman also contends the evidence was insufficient to support his conviction for second degree assault. Thurman argues that the evidence was not sufficient because A.W. testified that she did not know whether the injury to her head was caused by the butt of the gun or by Thurman's hand.

Neb. Rev. Stat. § 28-309 (Cum. Supp. 2006) provides in relevant part that "[a] person commits the offense of assault in the second degree if he or she [i]ntentionally or knowingly causes bodily injury to another person with a dangerous instrument."

A.W. testified on direct examination that Thurman struck her on the head with the butt of a handgun. On cross-examination, in response to an inquiry as to whether it might have been Thurman's hand that struck her rather than the butt of the gun, A.W. testified that "whatever it was it cut the head open." Also admitted into evidence was Galvan's testimony that A.W. had cuts to her head and a photograph of the head wound in question.

---

[16] *Id.*

An appellate court does not pass on the credibility of witnesses.[17] Based upon the evidence presented to it, a jury could have reasonably concluded that A.W.'s head wound was caused by the gun, rather than by Thurman's bare hand. We conclude the evidence was sufficient to support Thurman's conviction for second degree assault.

Thurman's second assignment of error is without merit.

### 3. DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING THURMAN'S MOTIONS FOR CONTINUANCE

In his third assignment of error, Thurman contends the district court erred in failing to grant his motion for continuance to depose Hanger and to obtain her medical records. A decision whether to grant a continuance in a criminal case is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion.[18] A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.[19] There is no abuse of discretion by the court in denying a continuance unless it clearly appears that the defendant suffered prejudice as a result of that denial.[20]

(a) District Court Did Not Abuse Its Discretion in Denying Thurman's Motion for Continuance to Depose Hanger

Thurman first argues that the district court erred in denying his motion for continuance to depose Hanger. One factor this court considers in determining whether a trial court abused its discretion in denying a continuance is whether the party seeking the continuance "exercised diligence in attempting to procure the evidence."[21] The record before this court indicates Thurman did not exercise diligence.

---

[17] Id.

[18] State v. Davlin, 272 Neb. 139, 719 N.W.2d 243 (2006).

[19] Id.

[20] State v. Perez, 235 Neb. 796, 457 N.W.2d 448 (1990).

[21] State v. Fleming, 223 Neb. 169, 180, 388 N.W.2d 497, 505 (1986).

As was noted by the State and the district court, and further conceded by Thurman, Hanger was listed as a witness at all times relevant to this prosecution. Moreover, the district court granted Thurman's discovery request to take depositions of all State witnesses. Thurman argues that Hanger would have invoked her Fifth Amendment right against self-incrimination had he attempted to depose her and that for this reason, it would not have been possible to take Hanger's deposition prior to trial. However, in order to preserve his right to depose Hanger, Thurman should have subpoenaed Hanger and made a record of any invocation of her Fifth Amendment rights. Instead, Thurman made no attempt to depose Hanger until halfway through his trial. The district court did not abuse its discretion in denying this motion for continuance.

### (b) District Court Did Not Abuse Its Discretion in Denying Thurman's Motion for Continuance to Obtain Hanger's Mental Health Records

Thurman also argues that he was entitled to a copy of Hanger's mental health records under *State v. Trammell*[22] and that the district court ought to have granted his motion for a continuance so he could obtain and review those records.

As with the motion relating to Hanger's deposition, Thurman's lack of diligence is fatal. Thurman argues that he was not aware that Hanger, with whom he was in a relationship, had mental health issues until approximately 1 week prior to trial when he received a video recording of Hanger's interview with law enforcement. However, a review of the record suggests Thurman should have had knowledge of Hanger's condition earlier.

Exhibit 25 is a copy of Hanger's statements made to law enforcement shortly after the incident in question. Thurman does not dispute that he was given a copy of these statements at least 5 months prior to trial. This document makes reference to Hanger's being "on medication," "sleeping heavily," "having flashbacks," and being "half out of it."

Even if this report was not sufficient to put Thurman on notice with regard to Hanger's mental health issues, the video

---

[22] *State v. Trammell*, 231 Neb. 137, 435 N.W.2d 197 (1989).

recording provided approximately 1 week before trial should have been sufficient. By Thurman's own admission, it was the receipt of this recording, which makes specific reference to Hanger's taking the medication clonazepam and spending time at a mental health facility, which prompted Thurman's eventual request for the records.

Despite the notice provided by both exhibit 25 and the video recording, Thurman made no attempt to request Hanger's records until halfway through his trial. The district court did not abuse its discretion in denying this motion for continuance.

Thurman's third assignment of error is without merit.

### 4. THURMAN'S SENTENCES WERE NOT EXCESSIVE

In his fourth and final assignment of error, Thurman argues the district court erred in imposing excessive sentences. Sentences within statutory limits will be disturbed by an appellate court only if the sentences complained of were an abuse of judicial discretion.[23]

■ When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime.[24]

Thurman was convicted of first degree false imprisonment, a Class IIIA felony,[25] punishable by up to 5 years' imprisonment[26]; first degree sexual assault, a Class II felony,[27] punishable by up to 50 years' imprisonment[28]; two counts of use of a weapon to commit a felony, both Class II felonies[29]; and second degree

---

[23] *State v. Iromuanya*, 272 Neb. 178, 719 N.W.2d 263 (2006).

[24] *State v. Marrs*, 272 Neb. 573, 723 N.W.2d 499 (2006).

[25] § 28-314(2).

[26] Neb. Rev. Stat. § 28-105(1) (Cum. Supp. 2006).

[27] § 28-319(2).

[28] § 28-105(2).

[29] Neb. Rev. Stat. § 28-1205(2)(b) (Reissue 1995).

assault, a Class IIIA felony.[30] Thurman was sentenced to 4 to 5 years' imprisonment for false imprisonment, 15 to 20 years' imprisonment for first degree sexual assault, 15 to 20 years' imprisonment for each count of use of a weapon to commit a felony, and 2 to 5 years' imprisonment for second degree assault, with the sentences to be served consecutively. Thurman could have been sentenced, under the statutory guidelines, to up to 160 years' imprisonment and was actually sentenced to between 51 and 70 years' imprisonment.

Thurman's sentences were well within the statutory guidelines. Our review of the record further indicates that the sentences were not an abuse of discretion. Thurman's final assignment of error is without merit.

### IV. CONCLUSION
The judgment of the district court is affirmed.

AFFIRMED.

---

[30] § 28-309(2).