774 N.W.2d 753 (2009)
278 Neb. 935
STATE of Nebraska, Appellee,
v.
Dwight L. TUCKER, Appellant.
No. S-08-623.
Supreme Court of Nebraska.
November 20, 2009.
*754 Thomas C. Riley, Douglas County Public Defender, and Timothy P. Burns for appellant.
Dwight L. Tucker, pro se.
Jon Bruning, Attorney General, and George R. Love for appellee.
HEAVICAN, C.J., and WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
*755 McCORMACK, J.

NATURE OF CASE
In a case where the only injury to the victim was a single gunshot wound that caused his death, we address whether it is irreconcilable for a judge in a bench trial to find the defendant guilty of unintentional manslaughter while also finding him guilty of the intentional use of a weapon to commit the felony of either terroristic threats, first degree assault, or second degree assault.

BACKGROUND

SHOOTING
Dwight L. Tucker testified that at around 12:30 a.m. on June 2, 2007, his cousin, Jerry Valentine, called and asked Tucker to assist in "a run" to sell drugs. Tucker agreed. Valentine picked Tucker up, and the two drove from North Omaha, Nebraska, to a gas station on 13th and Vinton Streets. The gas station was closed, but the exterior of the convenience store and the pumps were well lit and monitored by three surveillance cameras. There was light street traffic in front of the station, and the pumps and convenience store were in plain view of the street.
Silent footage from the cameras showed that at approximately 1:15 a.m., Valentine's vehicle pulled up askew to the gas pumps, which were in front of the convenience store. Almost immediately thereafter, Daniel Everbeck pulled up in front of a pay telephone located on the wall outside the front entrance of the convenience store. Tucker testified that when they pulled up, he saw Everbeck and assumed he was the person Valentine would be selling drugs to.
Everbeck opened his door, but did not immediately exit. Instead, the two vehicles stood, in plain sight of one another, until Valentine's vehicle backed up out of view from the cameras. Tucker explained at trial that after backing up, they parked on a side street.
Tucker testified that he and Valentine exited Valentine's vehicle. Before doing so, Valentine put a gun on Tucker's lap and told him to watch his back in case somebody tried to rob him. Tucker testified that he did not know the gun was loaded.
Everbeck exited his vehicle and walked around the front and toward the pay telephone. He then disappeared from view of the camera because the pay telephone and the immediate vicinity of the pay telephone are not captured. Approximately 30 seconds later, Everbeck returned to retrieve something from the vehicle and walked back to the pay telephone.
One minute after Everbeck walked to the telephone, Valentine appeared strolling through the area of the gas pumps, looking in the direction of the pay telephone, before leaving the camera's coverage area. Tucker explained at trial that Everbeck was on the telephone and that Valentine was walking around "to make sure it wasn't a setup" and that everything was "cool." Tucker waited by the side of the building.
Everbeck's girlfriend, a bartender at a bar across the street from the gas station, testified that Everbeck called her on her cellular telephone at 1:17 a.m. The conversation lasted approximately 2 minutes, and she noted nothing out of the ordinary. They made arrangements to meet after she was finished closing the bar. She did not know where Everbeck was calling from.
A little over 2 minutes after Valentine had strolled through the gas pump area, Valentine and Tucker approached Everbeck from the side of the convenience store. The three were in view of the *756 cameras only briefly. During this time, Everbeck stood with his back to his vehicle and facing Tucker, whose back was facing the convenience store. Valentine stood slightly to the side, with his back at an angle between the convenience store and the side lot from which they came.
Everbeck soon appeared to become agitated with Tucker, gesticulating in an animated fashion toward him and apparently talking. Tucker stood, apparently silent, with his arms straight at his sides, but looking at Everbeck. Tucker explained at trial that he was holding the gun aimed at the ground.
Everbeck then appeared to shove Tucker in the direction of the pay telephone, and Tucker and Everbeck disappeared from view of the cameras. At approximately the same time, another camera showed Valentine calmly walking away in the direction from which they came and looking back in the direction of the pay telephone. Then, Valentine started to run and Tucker appeared in the camera's view, running away behind him. The actual shooting was not recorded by the cameras. Everbeck's girlfriend testified that she heard a bang outside the bar approximately 30 seconds after her conversation with Everbeck had ended.
Tucker explained at trial that when they approached Everbeck, Valentine greeted him, saying, "[W]hat's up." Everbeck ignored Valentine and angrily turned his attention to Tucker instead, asking, "What you got a gun for? What, you going to shoot me?" Tucker stated he did not respond. According to Tucker, Everbeck then pushed him and started coming toward him, backing him into the wall where the pay telephone was located. Tucker testified that Everbeck tried to reach for his gun and tried to hit him. As Tucker pulled his arm back to keep the gun out of Everbeck's reach, it "just went off."
The police arrived at the scene approximately 10 minutes after the shooting. Everbeck was semiconscious. Everbeck told an officer that he was in pain and that he had been shot by a black male. On the way to the hospital, Everbeck gave an approximate description of the age and height of the shooter. Everbeck did not explain the circumstances of the shooting nor indicate whether he had been robbed.
Another officer searching the area soon found Tucker, dressed in a white tank top and sweatpants, approximately three blocks from the gas station. Tucker was waiting at the corner and had no identification or other possessions on his person. Tucker gave the officer his brother's name as an alias.
The police also found a semiautomatic revolver and a red-and-white striped shirt under a tree. Tucker appears wearing that same shirt in the surveillance videos. The revolver was later identified as the weapon used in the shooting. Expert testimony established that the gun was working properly. When found, the gun contained five live rounds in the magazine and one live round in the chamber.
Everbeck died at the hospital as the result of the gunshot wound. The bullet had entered his lower abdomen, traveled through the liver and lacerated the abdominal aorta. There was no evidence of any injuries other than those attributable to the gunshot wound. The forensic pathologist stated that the bullet entered Everbeck at a slightly downward angle and exited through his back. According to the toxicology report, at the time of his death, Everbeck had a vitreous humor ethanol level of 0.174 and cannabinoids were also detected in his system.
*757 The authorities found numerous items in Everbeck's pockets, including Everbeck's identification, approximately $15, cigarettes, two prescription oxycodone pills, and approximately 11.8 grams of what appeared to be marijuana. There was also a paycheck stub dated June 1, 2007, for $267.54. A witness indicated that Everbeck cashed this check earlier that day. The evidence was unclear, however, as to how much of that check Everbeck spent prior to the shooting.

CHARGES AND VERDICT
Tucker was charged with first degree murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a felon. Tucker waived a jury trial. The parties stipulated that he was a convicted felon. The State's charge of first degree murder was based on alternative theories of premeditation and felony murder.
The court found Tucker guilty of the lesser-included offense of manslaughter "by unintentionally causing the death of... Everbeck while in the commission of an unlawful act." The court did not specify the unlawful act, although it also found Tucker guilty of possession of a deadly weapon by a felon. Finally, the court found Tucker guilty of use of a deadly weapon to commit a felony. In so doing, the court explained that the predicate felony to that offense was "assaultat least in the first and/or second degree on ... Everbeck and/or a terroristic threat towards... Everbeck."

NEBRASKA COURT OF APPEALS
Tucker appealed his convictions to the Nebraska Court of Appeals.[1] Among other assignments of error no longer relevant, Tucker argued there was insufficient evidence to convict him of the charge of use of a weapon to commit a felony, especially in light of the trial court's finding that he did not intentionally kill Everbeck. Although the Court of Appeals recognized that the predicate felony for use of a deadly weapon must be intentional, it found the evidence sufficient to support the trial court's finding of the intentional act of terroristic threats. The Court of Appeals did not address the trial court's findings of first or second degree assault. A partial dissent to the case argued that there was insufficient evidence to prove any of these predicate offenses. With regard to first or second degree assault, the dissent argued, "The mere fact that the victim in this case was killed does not allow an inference that Tucker intended to inflict any bodily injury ...."[2] As for terroristic threats, the dissent argued that the majority's opinion "results in the inescapable conclusion that anytime somebody holds a firearm in the presence of somebody else, there has been a terroristic threat, and there is no authority for such an expansive conclusion."[3]
We granted Tucker's petition for further review.

ASSIGNMENT OF ERROR
Tucker asserts that the Court of Appeals erred in affirming the use of a deadly weapon to commit a felony conviction, because there was insufficient evidence as a matter of law to sustain this finding.

STANDARD OF REVIEW
On a question of law, an appellate court reaches a conclusion independent of *758 the court below.[4]
When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[5]

ANALYSIS
The only conviction being challenged by this petition for further review is the use of a weapon to commit a felony. In his petition for further review, Tucker makes three basic arguments under what he classifies as an insufficiency of the evidence claim. First, Tucker argues there was insufficient evidence to support the predicate offenses of first degree assault, second degree assault, or terroristic threats. Second, Tucker argues that such predicate offenses are inconsistent with the trial court's verdict that he unintentionally killed Everbeck. Third, Tucker asserts that second degree murder and terroristic threats cannot be used as the predicate offenses for the use of a weapon charge, because those crimes can be committed recklessly and the trial court did not specify under what theory he would be guilty.

PREDICATE CRIME MUST BE INTENTIONAL
In State v. Ring,[6] we explained that use of a weapon "`to commit any felony'" was synonymous with use of a weapon "`for the purpose of committing any felony.'" Thus, the felony motor vehicle homicide presented in that case, which is by definition committed unintentionally, could not form the basis of a use of a weapon conviction. We explained that a person cannot use a weapon "for the purpose of" unintentionally committing another crime.[7]
In State v. Pruett,[8] we similarly reversed the defendant's use of a weapon conviction where the jury found the defendant guilty of manslaughter by unintentionally causing another's death during a reckless assault. The defendant in Pruett thought there was only a "dummy round" in the chamber, and he was trying "`to mess with'" his friend when he fired in his direction.[9] We explained that both manslaughter and reckless assault are unintentional crimes and thus could not be used as predicate offenses for the use of a weapon conviction.
Later, in State v. Thurman,[10] we explained that while a purely unintentional crime could not form the predicate offense for a use of a weapon conviction, the predicate crime need not be a specific intent crime. Instead, the predicate offense could be a general intent crime. Thus, first degree sexual assault could be the predicate crime for the use of a weapon conviction. We noted it would be "`absurd'" to say a weapon was not used "`for the purpose of' subjecting another to sexual penetration through the use of force, *759 threat of force, coercion, or deception."[11]
These cases make clear that Tucker's conviction of unintentional manslaughter could not form the basis of the use of a weapon conviction unless predicated on the commission of an intentional unlawful act. Reckless assault and reckless terroristic threats would be an insufficient basis for the use of a weapon conviction. In contrast, intentional terroristic threats or intentional assault could legally form the basis for an unintentional manslaughter conviction and the predicate for a use of a weapon charge.

FAILURE TO SPECIFY INTENT
We find no merit to Tucker's argument that his conviction must be reversed because the court failed to specify whether the predicate crimes were committed intentionally as opposed to recklessly. A trial judge is presumed in a jury-waived criminal trial to be familiar with and apply the proper rules of law, unless it clearly appears otherwise.[12] In this case, it is especially clear that the judge was aware that the predicate offense must be intentional. The crime of first degree assault can only be committed intentionally.[13] And although the crimes of second degree assault and terroristic threats can be committed recklessly, we will assume that the judge, being aware of the law, found Tucker had committed those crimes intentionally.

INCONSISTENT VERDICT
We find no inherent inconsistency between the trial court's rejection of the murder charges and its conclusion that Tucker had committed intentional assault or intentional terroristic threats. In so concluding, we bear in mind that any rule barring an inconsistent judgment does not encompass cases where it is "merely difficult to find a truly satisfying explanation for the differing conclusions."[14] While it may at first appear the judge concluded the same act was both intentional and unintentional, a closer examination of the object of the mens real or the different offenses reveals that the crimes do not involve the same act and that the judge's findings were reconcilable.
Both first[15] and second[16] degree murder are specific intent crimes. Thus, by acquitting Tucker of first and second degree murder, the trial court made the implicit finding that Tucker lacked the specific intent to kill and that he also lacked the specific intent to commit any of the listed felonies for felony murder. By finding Tucker guilty of unintentional manslaughter, the court found that Tucker did not intend to kill Everbeck, but that he did kill Everbeck during the intentional commission of an unlawful act.[17]
The crime of terroristic threats requires the specific intent to terrorize, not an intent to kill, and it is not one of the felonies listed for felony murder. Assault is a *760 general intent crime that requires only the intent to commit the assault, and not the specific injury that results.[18] Assault also is not a listed predicate felony for felony murder. It was consistent for the court to conclude that Tucker intended to commit assault but did not intend for Everbeck to die as a result of the assault. It was likewise legally consistent for the court to conclude that Tucker intended to terrorize Everbeck,[19] but did not intend to kill him.

SUFFICIENCY OF EVIDENCE
The final question Tucker presents is whether the evidence was sufficient for the trial court to conclude he had committed these predicate crimes of assault and/or terroristic threats. A reversal for insufficiency of the evidence should be treated no differently than a trial court's granting a judgment of acquittal at the close of all the evidence. A trial court, in passing on such a motion, considers all of the evidence it has admitted, and to make the analogy complete, it must be this same quantum of evidence which is considered by the reviewing court.[20] When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[21]
We do not express any opinion as to the crime of, nor the sufficiency of the evidence of, terroristic threats, because we determine that assault constitutes the predicate felony for the use of a weapon charge. We find, instead, that the evidence was sufficient to support intentional assault, the element of which is intentionally or knowingly causes serious bodily injury to another person. There was testimony at trial that the gun was in working order, and Tucker admitted he shot Everbeck. While Tucker testified that he did not know the gun was loaded and that it "just went off," Tucker's credibility was a matter for the trier of fact. Although the trial court concluded that Tucker did not rob Everbeck and did not intend to kill him, the court was not thereby obligated to accept Tucker's explanation that the shooting was accidental. Viewed in a light most favorable to the State, the facts that the gun was operational, was loaded, and was used to shoot Everbeck are enough to infer that Tucker pulled the trigger intentionallyeven if he harbored such intent only briefly. Thus, the evidence was sufficient to establish that Tucker intended to commit an assault.

CONCLUSION
We find that based on the predicate offense of intentional assault, the evidence was sufficient to support the trial court's judgment that Tucker was guilty of use of a weapon to commit a felony. There being no further issues raised by Tucker in his petition for further review, we affirm the judgment of the Court of Appeals, which affirmed the judgment of the trial court.
AFFIRMED.
NOTES
[1] See State v. Tucker, 17 Neb.App. 487, 764 N.W.2d 137 (2009).
[2] Id. at 504, 764 N.W.2d at 152 (Irwin, Judge, concurring in part, and in part dissenting).
[3] Id. at 503, 764 N.W.2d at 152 (Irwin, Judge, concurring in part, and in part dissenting).
[4] State ex rel. Reed v. State, 278 Neb. 564, 773 N.W.2d 349 (2009).
[5] State v. Canaday, 263 Neb. 566, 641 N.W.2d 13 (2002).
[6] State v. Ring, 233 Neb. 720, 724, 447 N.W.2d 908, 911 (1989).
[7] Id. at 725, 447 N.W.2d at 911.
[8] State v. Pruett, 263 Neb. 99, 638 N.W.2d 809 (2002).
[9] Id. at 102, 638 N.W.2d at 813.
[10] State v. Thurman, 273 Neb. 518, 730 N.W.2d 805 (2007).
[11] Id. at 524, 730 N.W.2d at 812.
[12] State v. Keup, 265 Neb. 96, 655 N.W.2d 25 (2003).
[13] Neb.Rev.Stat. § 28-308 (Reissue 2008).
[14] United States v. Wilson, 342 F.2d 43, 45 (2d Cir. 1965).
[15] State v. Davlin, 272 Neb. 139, 719 N.W.2d 243 (2006); State v. Aldaco, 271 Neb. 160, 710 N.W.2d 101 (2006); State v. Dixon, 237 Neb. 630, 467 N.W.2d 397 (1991).
[16] See, State v. Davlin, supra note 15; State v. Weaver, 267 Neb. 826, 677 N.W.2d 502 (2004); State v. Burlison, 255 Neb. 190, 583 N.W.2d 31 (1998); State v. Dean, 237 Neb. 65, 464 N.W.2d 782 (1991).
[17] See Neb.Rev.Stat. § 28-305 (Reissue 2008).
[18] See, e.g., State v. Williams, 243 Neb. 959, 503 N.W.2d 561 (1993).
[19] See Neb.Rev.Stat. § 28-311.01 (Reissue 2008).
[20] State v. Palmer, 257 Neb. 702, 600 N.W.2d 756 (1999).
[21] State v. Canaday, supra note 5.