IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE V. CONLEY

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

DUANE R. CONLEY, APPELLANT.

Filed December 31, 2019.    No. A-19-175.

Appeal from the District Court for Douglas County: LEIGH ANN RETELSDORF, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Katie L. Jadlowski for appellant.

Douglas J. Peterson, Attorney General, and Erin E. Tangeman for appellee.

PIRTLE, RIEDMANN, and WELCH, Judges.

WELCH, Judge.

## INTRODUCTION

Duane R. Conley appeals his jury conviction of terroristic threats and his sentence of 30 months' imprisonment followed by 18 months' postrelease supervision with credit for time served. Conley appeals alleging that there was insufficient evidence to support his conviction, that the sentence imposed was excessive, and that he was entitled to additional credit for time served. For the reasons set forth herein, we affirm.

## STATEMENT OF FACTS

Conley's charge arose from an April 2018 incident in which he encountered a motorist, Russell Liekus, who was driving westbound on a street in Omaha. Liekus was returning home when he encountered Conley and two other individuals crossing a street on foot. Liekus testified that the three individuals seemed to be intoxicated because they appeared oblivious to traffic as

they crossed the street, not at a crosswalk, and he had to stop his vehicle to allow them to cross the street. While Liekus' vehicle was stopped, Conley, who had already crossed the street and was on the opposite sidewalk, ran back into the street and stood in front of Liekus' vehicle, placed his hands on the front of Liekus' vehicle, and began yelling at Liekus. Liekus testified that the man had a blue cast on his left arm from his elbow to his wrist and was yelling something like "do you want some of this." When shown a photograph of Conley in a blue cast, Liekus identified the person in the photograph as the person who approached his vehicle. Liekus testified that Conley's demeanor was aggressive and that he was unsure what caused Conley to become so agitated so quickly.

As soon as Conley moved from the front of his vehicle, Liekus drove past Conley. After driving only a short distance, Liekus heard something hit his vehicle, which he believed was a drinking glass that had been thrown at his vehicle. Liekus then pulled his vehicle over and got out in order to assess what damage, if any, had occurred. While he did that, Liekus testified that Conley "started approaching [him] aggressively from a distance." When Liekus saw Conley approaching, Liekus returned to the driver's seat but, in his haste, failed to place his foot on the brake which prevented him from immediately placing the car in gear. During the delay, Conley reached the vehicle and Liekus observed that Conley had two knives "sticking out of either side" of the blue cast that Conley was wearing on his left arm. Liekus testified that when he observed the knives which protruded from the cast at least a fingers length beyond the length of Conley's closed fist, Conley was 2 feet or less from his face and located just outside of his rolled-down driver's side window. Liekus testified that Conley was "animated and agitated" and yelled numerous statements, but he could specifically remember Conley asking if Liekus "wanted some of this" as he raised his arm with the cast containing exposed blades.

Liekus was finally able to get his vehicle out of park and into gear and drove away. When he was a safe distance away, he encountered a man on a bike who asked Liekus if he had seen the knives. Liekus responded in the affirmative and called the police. Liekus testified that he was fearful through the entire encounter and, at trial, identified the knives, separately preserved by police and admitted into evidence, as the same knives which he saw protruding from Conley's cast.

Maureen Thomsen, a resident of the area where the incident took place, also testified at trial. Thomsen testified that she was outside smoking on the porch of her house just prior to the time of the alleged incident when she encountered three individuals, including Conley, and that Conley had asked her if he could "bum a smoke." Thomsen testified that when she reached to hand Conley a cigarette, she noticed he was wearing a cast with knives sticking out of it. When Thomsen inquired about the cast, Conley responded "I'm not so worried about my arm. [I'm] going after somebody . . . the woman I am seeing is cheating on me and so I need to take care of business." She stated that Conley became agitated when he began to talk about the knives. She also testified that following the exchange with Conley, she called the 911 emergency dispatch service and informed the dispatcher that she saw a man in possession of knives whose intention may have been to harm someone. At trial, Thomsen identified the knives admitted into evidence as the knives she saw.

Officer Cole Johannsen also testified at trial. He stated that he and his partner responded to a call that a man had been threatened with a knife by a man wearing a blue cast. Johannsen

testified that upon reaching the scene, he encountered a man wearing a blue cast on his arm whom he identified as Conley. Johannsen indicated that Conley was very confrontational and appeared intoxicated due to his slurred speech and the odor of alcohol emanating from his person. Johansen testified that he attempted to obtain identification from Conley and was only successful when he retrieved a wallet from Conley's pocket. After performing a pat-down search, Johannsen found the two small paring knives inside Conley's pockets which were the knives later identified at trial by Liekus and Thomsen. When additional officers arrived, Conley became increasingly confrontational resulting in the officers needing to use zip cuffs to restrain him. Conley also resisted the officers' attempts to place him in their cruiser.

Following the jury trial, the jury convicted Conley of the sole charge of terroristic threats. The district court sentenced Conley to 30 months' imprisonment followed by 18 months' postrelease supervision with 144 days' credit for time served. Conley now appeals.

## ASSIGNMENTS OF ERROR

Conley assigns as error that (1) the evidence was insufficient to support his conviction, (2) the sentence imposed was excessive, and (3) he did not receive sufficient credit for time served against his sentence.

## STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. McCurdy*, 301 Neb. 343, 918 N.W.2d 292 (2018); *State v. Sherrod*, 27 Neb. App. 435, 932 N.W.2d 880 (2019). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. McCurdy, supra*; *State v. Sherrod, supra*.

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Chairez*, 302 Neb. 731, 924 N.W.2d 725 (2019).

Whether a defendant is entitled to credit for time served and in what amount are questions of law, subject to appellate review independent of the lower court. *State v. Phillips*, 302 Neb. 686, 924 N.W.2d 699 (2019).

## ANALYSIS

### INSUFFICIENCY OF EVIDENCE

Conley first argues that the evidence admitted at trial was insufficient to support his conviction of terroristic threats.

A conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. McGhee,* 274 Neb. 660, 742 N.W.2d 497 (2007); *State v. Tucker,* 17 Neb. App. 487, 764 N.W.2d 137 (2009), *affirmed* 278 Neb. 935, 774 N.W.2d 753. A person commits terroristic threats if he or she threatens to commit any crime of violence with the intent to terrorize another. Neb. Rev. Stat. § 28-311.01(1)(a) (Reissue 2016). Accordingly, to sustain a conviction here, the State

was required to prove two elements: (1) that Conley threatened to commit a crime of violence and (2) that Conley did so with the intent to terrorize another. We will analyze these elements independently.

A "crime" is defined as "[a]n act that the law makes punishable; the breach of a legal duty treated as the subject-matter of a criminal proceeding." Black's Law Dictionary, 451 (10th ed. 2014). See *State v. Palmer*, 224 Neb. 282, 294, 399 N.W.2d 706, 717 (1986) ("a 'crime' is an act or omission for which one is subject to punishment by public authority"). By that same standard, violence is the exertion of physical force so as to injure or abuse. *State v. Palmer, supra*. Thus, a "crime of violence" is "an act which injures or abuses through the use of physical force and which subjects the actor to punishment by public authority." *Id.* at 294, 399 N.W.2d at 717. Taken together, we must first determine whether Conley's conduct involved a threat to commit a crime of violence.

A "deadly weapon" is defined as "any firearm, knife, bludgeon, or other device, instrument, material, or substance, whether animate or inanimate, which in the manner it is used or intended to be used is capable of producing death or serious bodily injury." Neb. Rev. Stat. § 28-109(8) (Reissue 2016). Second degree assault is defined, in part, to mean "intentionally or knowingly caus[ing] bodily injury to another person with a dangerous instrument." Neb. Rev. Stat. § 28-309(1)(a) (Reissue 2016). Most certainly, then, second degree assault would fit within the definition of a crime of violence. See *State v. Rye,* 14 Neb. App. 133, 705 N.W.2d 236 (2005). Thus, in order to satisfy the first element of terroristic threats, we must first determine whether Conley was threatening to commit the offense of second degree assault.

In analyzing the issue of a threat in connection with terroristic threats, we have held:

A defendant does not have to actually commit a crime of violence, because it is the threat of violence which is at the heart of the crime of terroristic threats. See [*State v. Rye,* 14 Neb. App. 133, 705 N.W.2d 236 (2005)]. For purposes of the offense of terroristic threats, a threat may be written, oral, physical, or any combination thereof. *State v. Curlile,* 11 Neb. App. 52, 642 N.W.2d 517 (2002). A direct expression of intention by the actor is not required because the intent with which an act is committed involves a mental process and intent may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident. *Id*. Whether a defendant possesses the requisite state of mind is a question of fact and may be proven by circumstantial evidence. *Id.*

*State v. Tucker*, 17 Neb. App. 487, 496, 764 N.W.2d 137, 147 (2009), *affirmed* 278 Neb. 935, 774 N.W.2d 753.

Here, Conley first encountered the victim by running back into the street where the victim's vehicle was stopped to allow Conley's acquaintances to cross the street. After yelling at the victim, Conley moved toward the driver's side of the victim's vehicle which then provided the victim the opportunity to get away. However, the confrontation did not end there as Conley hurled an object which struck the victim's vehicle as it drove away. When the victim stopped a second time to inspect his vehicle for damage, Conley pursued the victim a second time, this time approaching the victim's driver's side window nearly 2 feet from the victim's head while brandishing the knives and yelling at the victim in an aggressive and agitated fashion "you want some of this." Notwithstanding this conduct, Conley argues, "Whereas Conley may have been 'very high

energy,' no specific threat of any kind was made. Further, Liekhus was clear that Conley did not direct the small blades at him in any affirmative manner, including no evidence that Conley waved the small blades up and down or in Liekhus' direction." Brief for appellant at 18.

A similar argument was made by the defendant in *State v. Tucker, supra*. In *Tucker*, the defendant, who held a gun rather than a knife, argued that the failure to point the gun at the victim should render the crime inapplicable. In response, this court stated:

"[T]erroristic threats cases will largely be determined by the context of the interaction between the involved people. Thus, the angle at which a gun is pointed directly at someone is not the determinative factor, although it is clearly an important factor." [*State v. Curlile*, 11 Neb. App.] at 57, 642 N.W.2d at 522. . . . But even if Tucker did not have the requisite intent at the time the gun was actually pointed at the victim, viewing the evidence in the light most favorable to the State, a rational finder of fact could conclude that Tucker, by visibly holding a gun while engaged in a face-to-face confrontation with the victim, threatened the victim with a crime of violence with the intent to terrorize the victim. The finder of fact could also reasonably conclude that Tucker intended to terrorize the victim without intending to kill him.

*State v. Tucker*, 17 Neb. App. at 496-97, 764 N.W.2d at 148.

The same holds true here. After our review of the record, we hold that a rational fact finder, when taking into account Conley's oral and physical conduct, could find that Conley was threatening to cause bodily harm to Liekus with the knives that Conley was brandishing in his raised arm and which extended a finger's length from his cast beyond his closed fist.

Conley separately argues that, as to the second element of terrorist threats, even if his conduct amounted to a threat to commit a crime of violence, his conduct could not be considered as intended to terrorize the victim. We disagree, again referring to our ruling in *Tucker*. We hold that a reasonable fact finder could conclude Conley was intending to terrorize the victim by threatening to cause bodily injury to Liekus with Conley's knives due to Conley's second approach of the victim's vehicle where he encountered Liekus a second time, only 2 feet from Liekus' face and yelling words which included, but were not limited to the phrase "do you want some of this," with blades exposed from a closed fist. Accordingly, Conley's first assignment of error fails.

EXCESSIVE SENTENCE

Second, Conley contends that the sentence imposed was excessive. Specifically, he claims that the district court failed to adequately consider Conley's motivation for the offense, his remorse, his education and employable skills, and the fact that his "criminal history was largely the product of untreated chemical dependence and unmanaged mental health." Brief for appellant at 24.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past

criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id*. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

Terroristic threats is a Class IIIA felony punishable by 0 to 3 years' imprisonment and 9 to 18 months' postrelease supervision if imprisonment is imposed and/or a $10,000 fine. See, Neb. Rev. Stat. §§ 28-105 and 28-311.01 (Reissue 2016). Conley's sentence of 30 months' imprisonment followed by 18 months' postrelease supervision is within the statutory sentencing range.

At the sentencing hearing, the court noted that it considered Conley's age, background, education, criminal history, and other information included in the presentence investigation report. The court then stated:

> You become assaultive and belligerent when you drink alcohol. The rest of the time it seems like you're a pretty decent person. It seems like . . . you become a very difficult -- frightening guy when you're angry. But I've considered all of those things.
>
> You know, I wish I could put you someplace for three or four years where it wasn't a prison, but it was some sort of treatment that didn't let you leave. You know, I wish I could do that, but I can't. Only [you are] going to be able to do that for yourself.
>
> I . . . sit and heard all of the facts and circumstances at the trial, so I understand the nature of the incidents of that night and I did read your letter and I do think that you are sincere in your remorse.
>
> So I'm not going to give you the maximum, but it'll be the judgment and sentence -- I think this sentence is appropriate -- that you serve 30 months in the Nebraska Department of Correctional Services. After that, you are sentenced to a term of 18 months of post-release supervision. And you're given credit for -- I think it's 144 days. There is some other time on there, but you were in Lancaster County and I can't give you credit for the sentence that you served down there. So they figured out 144 days by looking at the register.
>
> . . . .
>
> And, you know, really, this is an opportunity to be clean for a while and then you have 18 months of assistance, so if you take advantage of it, you may not end up in prison for the rest of your life. So it's up to you.

The presentence investigation report submitted to the district court was not a "full" presentence investigation report (PSR) because an interview of Conley was not completed due to his commission of an assault while out on bond resulting in his incarceration in Lancaster County. At the time of the preparation of the PSR, Conley was 44 years old. Although the PSR did not indicate Conley's education level, defense counsel stated at the sentencing hearing that Conley had earned a GED and a 2-year certificate in construction technology. Defense counsel also stated that Conley maintained consistent employment until Conley's substance abuse and mental health issues derailed him. Conley's criminal history includes convictions for unauthorized use of a vehicle, DUI, assault (four convictions), public intoxication (four convictions), second offense

- 6 -

DUI (two convictions), theft of services, criminal trespass, driving under suspension, resisting arrest, failure to appear, and no proof of insurance. While out on bond in the instant case, Conley was convicted of assault in Lancaster County. The PSR also noted that Conley had failed to appear in court seven times, even though he only had one conviction for the offense. The probation officer noted in the PSR that Conley "has an extensive history of violent behaviors, extensive history of public intoxication, DUIs and a history of failing to appear in Court unless arrested on a warrant." There was no interview with Conley and no level of service/case management inventory completed due to Conley's incarceration in Lancaster County.

Contrary to Conley's arguments, the district court specifically stated that it had considered his education and his remorse which the court felt was sincere. The court also acknowledged Conley's substance abuse issues and the circumstances surrounding the offense. Further, the court noted that it wished that it could place Conley somewhere for 3 to 4 years that was not prison but where Conley could not leave; however, the court acknowledged that was not an option. Through the sentence imposed, the court noted that Conley would be "clean" during the 30-month sentence and, during the 18 months of postrelease supervision, he would have assistance in dealing with his substance abuse issues.

Based upon the fact that the sentence imposed was within the statutory sentencing range, Conley's criminal history, his lack of respect for court rules as evidenced by his numerous instances of failing to appear for court, his history of violent behavior, his history of public intoxication, and the circumstances surrounding the offense, the sentenced imposed by the district court was not an abuse of discretion. Accordingly, this assignment of error fails.

CREDIT FOR TIME SERVED

Conley's final assignment of error is that the district court erred in failing to award him credit for 36 days that he served in the Lancaster County jail which was not otherwise applied to his Lancaster County sentence and for which he was incarcerated in Lancaster County solely as the result of the instant case.

The Nebraska Supreme Court recently stated in *State v. Mueller*, 301 Neb. 778, 803-04, 920 N.W.2d 424, 442 (2018), *modified on denial of rehearing* 302 Neb. 51, 921 N.W.2d 584 (2019):

> Neb. Rev. Stat. § 83-1,106 (Reissue 2014) provides in relevant part:
>
> (1) Credit against the maximum term and any minimum term shall be given to an offender for time spent in custody as a result of the criminal charge for which a prison sentence is imposed or as a result of the conduct on which such a charge is based. This shall specifically include, but shall not be limited to, time spent in custody prior to trial, during trial, pending sentence, pending the resolution of an appeal, and prior to delivery of the offender to the custody of the Department of Correctional Services, the county board of corrections, or, in counties which do not have a county board of corrections, the county sheriff.
>
> . . . .
>
> (4) If the offender is arrested on one charge and prosecuted on another charge growing out of conduct which occurred prior to his or her arrest, credit against the maximum term and any minimum term of any sentence resulting from such prosecution

shall be given for all time spent in custody under the former charge which has not been credited against another sentence.

We have stated that because of the mandatory "shall" language used in § 83-1,106, the statute mandates that credit for time served must be given for time spent in custody on a charge when a prison sentence is imposed for a conviction of such charge. *State v. Banes,* 268 Neb. 805, 688 N.W.2d 594 (2004). We further stated in *Banes* that § 83-1,106(4) was to be read "as requiring that such credit shall be given which has not otherwise been applied, and the import of this subsection is that all credit available due to presentence incarceration shall be applied, but only once." 268 Neb. at 811, 688 N.W.2d at 599. We also recently stated that "what matters in the credit for time served analysis is not whether [the defendant] was detained in Nebraska and awaiting trial and sentencing on Nebraska charges, but, rather, whether [the defendant] was forced to be in custody *because of those charges*." *State v. Leahy,* 301 Neb. 228, 917 N.W.2d 895, 900-01 (2018) (emphasis in original).

Here, Conley contends that he was incarcerated in the Lancaster County jail for 75 days, admits that he received a 60-day sentence following his conviction in relation to the Lancaster County assault charge and contends that he should receive credit for "the period of incarceration beyond [his] 60-day Lancaster County sentence . . . where [he] was forced to be in custody as a result of the . . . terroristic threats . . . charge." Brief for appellant at 30. Inherent in his argument is that some portion of his incarceration in Lancaster County was related to the Douglas County terroristic threats charge as opposed to the Lancaster County assault charge.

We find that Conley's claims fail for two reasons. First, there is nothing in the PSR that indicates that Conley served time in the Lancaster County jail for the Douglas County terrorist threats charge. The PSR explicitly reflects that Conley spent 56 days incarcerated in Lancaster County and that he was sentenced to 60 days' imprisonment for the assault conviction. Nothing in the PSR reflects that Conley's time spent in jail was for anything other than the Lancaster County assault charge.

Second, even though Conley argues that he served an additional 15 days' jail time in Lancaster County from October 18 until November 9, 2018, and that he should receive credit for those days served, the PSR does not support this claim. The PSR reflects that Conley committed an unrelated assault in Lancaster County on October 18. However, there is nothing in the PSR to reflect whether Conley was incarcerated as the result of this offense. Further, although the PSR notes that Conley was located on November 9, the PSR does not specify where Conley was located. As such, there is nothing explicit in the PSR that reflects that Conley spent more than 56 days incarcerated in Lancaster County or, more specifically, indicates he was in the Lancaster County jail for the period of time from October 18 through November 9. If there was any time Conley spent incarcerated in Lancaster County in excess of 60 days that was solely due to the Douglas County terroristic threats charge, we cannot make that determination from the record in this case. It is incumbent upon the appellant to present a record which supports the errors assigned. *State v. Iromuanya*, 272 Neb. 178, 719 N.W.2d 263 (2006). Accordingly, the record does not reflect that Conley is entitled to any additional credit for time served and this assignment of error fails.

## CONCLUSION

Having considered and rejected Conley's assigned errors, we affirm his conviction and sentence.

AFFIRMED.